**CHICAGO S. S. LINES, Inc., et al. v. UNITED STATES LLOYDS, Inc., et al.**

(Circuit Court of Appeals, Seventh Circuit. April 14, 1926.)

No. 3630.

1. **Insurance ⬤⟿416—Sinking of vessel alongside dock, due to open rivet holes, held to have resulted from want of due diligence on part of owner, precluding recovery on policy.**

Sinking of vessel alongside dock, due to water leaking through open rivet holes, negligently permitted to remain by owner, *held* to have resulted from want of due diligence on part of owner, precluding recovery on policy.

2. **Insurance ⬤⟿416—Owner's negligence in permitting open rivet holes, resulting in ship's sinking, held not excused because water could have been taken care of by pumps had it reached them.**

Negligence of shipowner in permitting open rivet holes below loaded water line, resulting in vessel's sinking alongside dock, *held* not excused because all vessels leak more or less, and that water could have been taken care of by pumps, had it reached them.

3. **Shipping ⬤⟿12.**

A "survey" of vessel is statement of its present condition.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Survey.]

4. **Insurance ⬤⟿470.**

As respects question of abandonment and waiver or acceptance thereof, surveyor appointed by underwriters must promptly and quickly meet such emergencies as arise in case of ship's sinking.

5. **Insurance ⬤⟿470—Acts of shipowner, after ship was raised by underwriters, in continuing in possession and attempting sale, held not to indicate intent to abandon within meaning of policy permitting recovery for constructive total loss.**

Acts of shipowner, after sinking of ship, in continuing in possession after ship was raised by underwriters and attempted sale thereof and appearance in foreclosure suit, *held* not to indicate intent to abandon within meaning of policy, so as to prevent recovery for constructive total loss.

6. **Appeal and error ⬤⟿1011(1).**

Circuit Court of Appeals is justified in accepting district court's findings on conflict of evidence.

7. **Insurance ⬤⟿665(4).**

Evidence *held* to show that there was at no time probability of constructive total loss of ship sinking at dock within meaning of policy.

8. **Insurance ⬤⟿470.**

Where there is no valid abandonment of ship within meaning of policy permitting recovery as for constructive total loss, acts of master do not become acts of insurer.

9. **Insurance ⬤⟿416—Underwriters held not liable for sinking of ship resulting from owner's negligence in permitting open rivet holes below loaded water lines.**

Where ship sunk because of owner's negligence in permitting open rivet holes below loaded water line, such condition did not constitute a liability covered by underwriters' undertaking.

10. **Insurance ⬤⟿470.**

Mortgagee of ship, being one of assured, must have necessarily joined in abandonment of ship to underwriters, to recover under policy as for constructive total loss.

Appeal from the District Court of the United States for the Eastern Division of the Northern District of Illinois.

Libel by the Chicago Steamship Lines, Incorporated, and the Northern Trust Company against the United States Lloyds, Incorporated, and others. Decree for libelants for a part of the recovery sought (2 F.[2d] 767), and libelants appeal. Affirmed.

Chas. E. Kremer, of Chicago, Ill., for appellants.

F. Bruce Johnstone, of Chicago, Ill., for appellees.

Before ALSCHULER, EVANS, and PAGE, Circuit Judges.

PAGE, Circuit Judge. Appellees, here called underwriters, on June 21, 1923, issued time lake hull insurance covering the steamer George W. Clyde, its outfit, engine, boilers, etc., loss payable to Chicago Steamship Lines, Incorporated, called owner, and Northern Trust Company, called trust company; the owner and trust company being appellants.

Although there is indorsed, under the provisions of the Merchant Marine Act of 1920 (Comp. St. Ann. Supp. 1923, §§ 8146¼–8146¼t), on the Clyde's papers, notice of mortgage for $40,000, which the record shows belongs to the trust company, no claim is made in the libel on that account.

The libel sets out the ownership of the Clyde and the placing of the insurance thereon, with loss payable as above set forth. Recovery was sought (a) because the Clyde, by sinking, became a constructive total loss; and (b) for earlier rudder and boiler repairs, paid on assigned claims by the trust company. The court found for appellants on (b), and adversely to them (a). The main defenses were that (1) there was no right of abandonment; (2) there was no abandonment in fact; and (3) the act of the owner caused the damage.

Important provisions in the policies are: The "sue and labor" clause:

"And in case of any loss or misfortune it shall be deemed lawful and necessary for the assured, their factors, servants, and assigns, to sue, labor, and travel for, in, and about the defense, safeguard, and recovery of the said ship, etc., or any part thereof, without prejudice to this insurance; to the charges whereof the said assurers will contribute according to the rate and quantity of the sum herein assured. No abandonment shall in any case be effectual unless notice thereof be made in writing to the agents of the assurers, nor unless the amount of the loss exceeds 75 per cent. of the combined value in this policy, as set forth above. And it is especially declared and agreed that no acts of the insurer or insured shall be considered as a waiver or acceptance of the abandonment."

The "Inchmaree" clause:

"This insurance also specially to cover (subject to the above free of average warranty) loss of, or damage to, the hull or machinery, through the negligence of master, mariners, engineers, or pilots, or through explosions, bursting of boilers, breaking of shafts, or through any latent defect in the machinery or hull, provided such loss or damage has not resulted from want of due diligence by the owners of the ship or any of them, or by the manager."

The tender clause:

"In the event of accident, whereby loss or damage may result in a claim under this policy, prompt notice thereof, with full and accurate details, shall be given in writing by the assured to the underwriters' surveyor, R. Parry-Jones, or other surveyor appointed by underwriters in his stead, and, when required by such surveyor, the vessel shall be forthwith docked by the assured for survey and/or repair, such surveyor also having the right to veto in connection with the place of repair proposed. The underwriters or their surveyor may take or may require the assured to take tenders for the repair of damage claimable under this policy, and, in cases where a tender is accepted with the approval of the underwriters, the underwriters will make an allowance at the rate of 30 per cent. per annum on the insured value for the time actually lost in waiting for tenders. In the event of the assured failing to comply with the conditions of this clause, or making arrangements for the repairs without consulting and securing the consent of the aforementioned surveyor, or to give the required notice of survey within 30 days of each accident, 15 per cent. will be deducted from the amount of the ascertained claim.

"The log book of the vessel shall be properly kept, and shall contain full information of every disaster met with, and be at all times available for examination by the underwriters' surveyor."

There are indorsements on the policies in part as follows:

"In case of claim for total or constructive total loss $100,000 shall be taken to be the insured value and payment by the underwriters of their proportions of that amount shall be for all purposes payment of a total loss. Any casualty to be immediately reported to R. Parry-Jones, Rockefeller Building, Cleveland, Ohio.

"Louis O. Kohtz, general agent Western department, eighteenth floor, Insurance Exchange, 175 W. Jackson Blvd., Chicago, Illinois."

The Clyde was built at Philadelphia, as an ocean going vessel, in 1872, and rebuilt in 1874. One Hoskins, president and manager of the owner, bought the Clyde for $11,000 and brought her to the Great Lakes in 1921. Her net tonnage was in excess of 1,500 tons, and on one trip she carried 1,600 tons safely.

Leaving Ecorse, Mich., June 21, 1923, effective date of the insurance, the Clyde injured her rudder. After repairs, she took on 1,000 tons of news print paper at Little Current, Ontario. While proceeding to Chicago, her boilers went out of commission. She was towed to Chicago, unloaded, and then towed to Sturgeon Bay, where new boilers were installed. While there, a lower gangway was cut in the port side, and under it was placed a strengthening plate, 26 feet long and 40 inches wide, called a doubler plate. Less than 40 inches below the gangway opening was the fender strake, and, instead of placing the doubler plate flat against the outside of the hull, its lower edge was over the fender strake, leaving at each end a triangular opening between the hull, the fender strake, and the doubler plate. To attach the doubler plate, rivets were burned or punched out of the hull plates and the new rivets used were smaller than those holes. Goodrow, captain of the Clyde, here called master, and Hoskins were both present when the doubler plate work was done. The master seems to have thought the work should have been calked, but says a foreman on the dock told him it was not usual to do so. It does not appear that the unnamed foreman knew where the loaded water line would be; both Hoskins and the master did know. Hoskins told the concern making the repairs at Sturgeon Bay that, loaded with 1,200 tons of paper, the whole of the doubler plate would be out of water. They had no talk about the manner in which the work was done. The contractor was behind with the work, and Hoskins hurried the work to get away to Little Current for 1,200 tons of news print paper, which he had ordered ready, and which he directed the master to load and carry to Chicago. Hoskins promised, but failed, to furnish ballast, asked for by the master. He went on the Clyde to Little Current and stayed there during part of the loading, which was finished on August 25th at 9:30 p. m., with 1,170 tons on. Shortly before the loading was finished, the mate, noticing some uneasiness in the boat,

said to the master, "She has got about enough on her," and the master said, "I think so too; we will finish this car and quit." The master says that he did not intend to load so that the doubler plate would be below the water line, but he knew that he had done so, and left the boat for the night without any thought of trouble. Some time later there was a list to port that continued until the Clyde lay against the dock with her deck at an angle of 45 degrees. After some hours, the Clyde righted herself, and on Sunday morning, August 26th, slowly settled to the bottom a few feet away from the dock, in 22 feet of water, on even keel, her upper deck out. The master, on the same day, wired Hoskins, at Chicago:

"Clyde sank at dock last night. Will need steam pump to float her and unload some paper."

Hoskins immediately wired Parry-Jones:

"Clyde sank at dock Little Current Ontario Canada."

On Monday, Hoskins wrote Parry-Jones, confirming the telegram, and adding:

"The Chicago Steamship Lines hereby notifies you that the Clyde has been abandoned to the underwriters, and claim will be made for the total amount of insurance. Any effort that is to be made for salvaging the steamer, or the cargo, must be made by the underwriters."

A copy was sent to Johnson & Higgins, who placed the insurance for the underwriters. On the same day, the master also wired Hoskins for money to pay the crew's wages and to a wrecking concern at Detour, Mich., asking for a 10-inch pump to float the Clyde.

On August 27th, Parry-Jones, by wire, requested the Reid Towing & Wrecking Company, at Port Huron, Mich., to go to Little Current and examine the Clyde. Reid, after an examination on the 28th, made a bid for raising and delivering the ship alongside the dock at Little Current for $5,500, "no cure, no pay." He began work about September 1st, and within a week, after taking out some of the paper, the boat was floated and placed alongside the dock. Parry-Jones represented the cargo underwriters also, and Capt. Hanson, for him, unloaded and sold the cargo. Hoskins arrived at Little Current probably August 30th, with money for the crew, and it was paid up to August 26th. Those not needed to man the Clyde were paid off. While he was there, three or four days, Hoskins says he tried to get Hanson to pay the crew's wages, because he insisted that the boat had been abandoned, but neither Hanson nor Reid would accept any responsibil-

ity. Hoskins did not tell the master that the boat had been abandoned, and the master knew nothing about any such claim.

On September 8, 1923, Parry-Jones wrote the owners as follows:

"Pursuant to your letter of August 27th we beg to advise you that your steamer lies at your service at Little Current under her own steam afloat and well able to take care of herself.

"The cargo has been sold for cargo underwriter's account, and is being taken out as rapidly as practicable so as to enable you to drydock the vessel at an American port for repairs. We suggest Ecorse, near Detroit, as the one nearest and most available."

After receiving that letter on the 9th, Hoskins wired the master on the 10th:

"Send day letter giving me condition and time before loading cargo."

On the 11th, the owner wired the master:

"Take Clyde Great Lakes Detroit for docking soon as possible wire when expect unloaded write full information about condition at once necessary answer promptly."

On the 12th the master wired owner:

"Expect to be unloaded Sept. 17. Will take Clyde to Detroit for dry docking when unloaded."

On the 14th the master wired advice of draft made by him for wages demanded by crew, and Hoskins replied:

"Advance no wage until boat reaches American port."

On the 17th the master wired:

"Clyde unloaded tomorrow must have funds to buy fuel and pay for supplies before leaving crew demanding wages past due Clyde may be attached before leaving Wire me two thousand dollars to-day Parry-Jones advises must get funds from owners."

On the 18th, 19th, and 20th were wires about the libel by the crew, their payment by the trust company, and on the 21st are telegrams, one to owner and one to trust company,

"Clyde leaves for Manitowoc about two this afternoon."

On the same day owner wired Parry-Jones:

"Clyde in dry dock Manitowoc Monday want surveyor not Farrell."

Because the owner did not want to take the Clyde to Ecorse, and Parry-Jones would not approve Manitowoc but did approve Chicago, she was taken to Chicago, put in dry dock, and some repairs were there made. Before her arrival there, the owner wired Parry-Jones, on September 22d:

"Have your surveyor South Chicago dry dock Monday for Clyde."

The trust company paid and had assigned to it claims for wages, fuel, groceries, etc., for the Clyde, all incurred subsequent to the alleged abandonment on August 27th. October 1st it filed its libel therefor, and subsequently the boat was sold under order of November 13, 1923. In October, Hoskins was trying to sell the Clyde.

On October 15th, the owner wrote Parry-Jones:

"The steamer George W. Clyde is now at Chicago being laid up for the winter, and is here at the disposal of the underwriters to whom she was abandoned on the 26th day of August due to her sinking at Little Current, Ontario. If you desire any particular disposition to be made of her for the benefit of the underwriters, we shall be glad to act upon the same. We shall expect the underwriters to pay all expenses that have been incurred in connection with her since her abandonment, including the present expense of laying her up for the winter. The proofs of loss are now being prepared and will be ready and sent to the underwriters this week."

And Parry-Jones replied, on October 16th:

"Acknowledging your letter of the 23d and advising us that you repeat your abandonment of this vessel made on August 26th last. As previously advised, this is not the proper channel through which to make abandonment, but, in so far as this office may directly or indirectly represent the underwriters, we must decline acceptance of abandonment, responsibility, or liability for any expense incurred in connection with the case."

Following those letters were others from Parry-Jones, clearly showing that he did not consider himself the proper agent to whom to make an abandonment, and that he at no time proceeded upon the theory that there had been an abandonment. The uncontradicted evidence in the record is that Parry-Jones was acting, and it was his duty to act, in the interest of all parties, "for whom it may concern."

It is urged that the sinking was due to the fault of the master in permitting the Clyde to be so loaded as to make the steamer unsteady, unstable, and, what is known in nautical parlance, cranky. We are not told with more definiteness of what the negligence consisted. The Clyde had a net tonnage capacity of 1,514, and she had carried 1,600 tons the year before. The owner

promised, but failed, to furnish ballast. The master loaded 30 tons less than directed by Hoskins, the owner's manager.

The record discloses no negligence on the part of the master. By the "Inchmaree" clause, the policy was specially made to cover certain losses occurring through the negligence of the master and others named, "provided such loss or damage has not resulted from want of due diligence by the owners of the ship or any of them, or by the manager."

[1] The improper placing of the doubler plate and the failure to calk the same, under the manager's supervision, permitted the water to enter the boat and soak into the rolls of paper on that side, thereby causing the listing and ultimately the sinking. We find that the sinking resulted from want of due diligence on the part of the manager of the owner of the ship, a loss not covered by the policy.

[2] The negligence of the manager is not excused by the fact, if it be a fact as urged, that all vessels leak more or less, and that much less water than could have been taken care of by the pumps, had it reached them, got into the hold by reason of the manner in which the plate was attached. That is neither reason nor excuse for the carelessness of the manager, whereby more than the inevitable amount of water did get into the hold in such a manner that it was soaked up by the cargo and never reached the pumps.

Provisions with reference to abandonment are:

"No abandonment shall in any case be effectual unless" (a) "notice thereof be made in writing to the agents of the assurers, nor" (b) "unless the amount of the loss exceeds 75 per cent. of the combined value in this policy, as set forth above, and" (c) "it is especially declared and agreed that no acts of the insurer or insured shall be considered as a waiver or acceptance of the abandonment."

The policies gave the name and address of the general agent of the insurers in Chicago, the home port of the Clyde. There is evidence that it was customary to give notice of abandonment through Johnson & Higgins, through whom the insurance was placed. Hoskins was in that office almost daily, but gave no notice of abandonment to them. The so-called letter of abandonment to Parry-Jones merely confirmed the earlier telegram, saying the Clyde had sunk, and informed Parry-Jones that "the Clyde has been abandoned to the underwriters." There was nothing to indicate that an abandonment was be-

12 F.(2d)—47

ing made to him, and, as soon as there was any suggestion of any such intention, Parry-Jones promptly and repeatedly said he was not the proper person to whom to make abandonment. The copy of that letter, sent to Johnson & Higgins, was the subject of discussion between Hoskins and Eldridge, Chicago manager for Johnson & Higgins, and Eldridge told him that was not the proper course, and that, if Hoskins really intended to abandon, he had better take it up with his attorney, which Hoskins said he would do. Hoskins in no way attempts to contradict Eldridge, and clearly there is not shown any intention to abandon to or through the brokers.

In the tender clause of the policy is the provision that:

"In the event of accident, whereby loss or damage may result in a claim under this policy, prompt notice thereof with full and accurate details, shall be given in writing by the assured to the underwriters' surveyor, R. Parry-Jones, or other surveyor appointed by underwriters in his stead, and, when required by such surveyor, the vessel shall be forthwith docked by the assured for survey and/or repair."

[3] That provision has nothing to do with abandonment. The abandonment provision is in the sue and labor clause. Beyond naming Parry-Jones as underwriters' surveyor, the scope of his powers, duty, and authority is not defined in the policies. A survey of a vessel is a statement of its present condition, and it seems that the surveyor has, under the policies, the requisite power to do all things requisite to accomplish necessary surveys. Libelant brought out the uncontradicted fact that in case of casualty Parry-Jones acted "for whom it may concern." In dealing with wrecks or lesser casualties to vessels, it is of the utmost importance, not only to the insured, but to the insurer, that immediate steps shall be taken, not only for the protection of the vessel and cargo, but also for the ascertainment of the exact condition and damage to each. By the former, the property is conserved, and by the latter the facts are ascertained and preserved for the determination of the rights of the parties. It is the duty and the right of the insured to save and conserve the property, and it is the right, if, indeed, not the duty, of the insurer to do the same. It is provided in the policy that:

"No acts of the insurer or insured shall be considered as a waiver or acceptance of the abandonment."

[4, 5] Any course, other than the promptest

action in dealing with casualties in commerce upon the sea and lakes would inevitably result in useless, great, and irreparable damage. It was the duty of Parry-Jones, as surveyor, to promptly and quickly meet such emergencies as arose in this case upon the sinking of the Clyde, and there is nothing to show, and it is not to be presumed, that he had any authority to accept an abandonment. Hoskins was not only advised by his policy as to the steps to take to accomplish an an abandonment and furnished with the name of a general agent in his own city, but was also told by Eldridge that he was not following the proper course but should take the advice of his counsel if he really intended to abandon. Instead of indicating an intent to abandon, we are of opinion that the record shows the contrary.

In Patapsco Ins. Co. v. Southgate, 5 Pet. (30 U. S.) 604, 622. (8 L. Ed. 243), the court said:

"There is some diversity of opinion among the elementary writers, and in the adjudged cases, as to what will constitute a valid abandonment. It seems, however, agreed, that no particular form is necessary, nor is it indispensable that it should be in writing. But, in whatever mode or form it is made, it ought to be explicit, and not left open as matter of inference from some equivocal acts. The assured must yield up to the underwriter all his right, title, and interest in the subject insured. For the abandonment, when properly made, operates as a transfer of the property to the underwriter, and gives him a title to it, or what remains of it, as far as it was covered by the policy. 3 Mar. Ins. 599. Phil. Ins. 447; and cases there cited."

"Abandonment is the surrender by the insured on a constructive total loss, of all his interest, to the insurer, in order to claim the whole insurance." Hughes on Admiralty, p. 80.

Was there a right to abandon? The policy condition is:

"No abandonment shall in any case be effectual * * * unless the amount of the loss exceeds 75 per cent. of the combined value in this policy, as set forth above."

The "combined value of this policy as above set forth" is $129,430; 75 per cent. of that is over $97,000. There is on the margin of the policy, the following:

"In case of claim for total or constructive total loss, $100,000 shall be taken to be the insured value and payment by the underwriters of their proportions of that amount shall be for all purposes payment of a total loss."

The parties seem to have treated 75 per cent. of $100,000 to be the amount of loss that would justify abandonment.

[6, 7] There is a conflict in the evidence, and we would be justified, as we have heretofore held, in accepting the findings of the District Court (Crosby Trans. Co. v. Sautter, 199 F. 383, 118 C. C. A. 67), but we have read the voluminous evidence, and find that there was at no time a high probability that there was a constructive total loss. The boat was several hours in sinking. There was no wind or bad weather conditions. Hoskins said that in sounding he found the water deeper in some places than in others, from which he inferred that the rock bottom would cause injury to the hull. He at no time made an examination of conditions. While the master, on the stand, said he would have abandoned the boat, yet he did not at any time even suggest to any one that the boat should be abandoned, and sent two wires, hereinabove set out, asking for pumps to pump out the water, which show a purpose wholly inconsistent with any thought of a right to abandon. Reid, acting on the advice of the master and his own examination, by making his bid of $5,500 to raise and place the boat alongside the dock or in case of failure to get nothing, showed that he could not have considered it, as he said, more than a "pumping job." Reid was a very competent man, of long experience. While there was some testimony that it would cost as high as $80,000 to recondition the boat, the weight of the evidence was to the contrary. The great preponderance of the evidence shows that there was at no time a high probability of constructive total loss.

[8] It is urged that, after abandonment, the acts of the master became the acts of the insurer. Under some circumstances that might be true, but, under the circumstances here shown, namely, that there was no valid abandonment, the acts of the master do not become the acts of the insurer. Richelieu & O. Nav. Co. v. Boston Ins. Co., 136 U. S. 408, 434, 10 S. Ct. 934, 34 L. Ed. 398. See, also, Orient Ins. Co. v. Adams, 123 U. S. 68, 75, 8 S. Ct. 68, 31 L. Ed. 63.

It is also urged that the raising and returning of the Clyde to the insured amounted to an acceptance of the abandonment. Numerous errors occur in the citations upon this point, and more care should be taken. We have examined all of the authorities. Because of difference between the facts in those cases and the facts here, they are inapplicable. While there is considerable variety in the facts which have been held to consti-

tute constructive acceptance of abandonment, in Copelin v. Phœnix Ins. Co., 9 Wall. (76 U. S.) 461, 19 L. Ed. 739, the court held that there arose a liability to pay the full amount of the policy because, after the attempt to abandon, the insurer took and retained possession of the boat over six months, a much longer time than was necessary to make reasonable repairs, and also because the repairs, when made, were inadequate. That is very different from this case.

[9] It is further urged that there was a waiver of any right the insurer might have had to assert the defense of unseaworthiness. We are of opinion that there was no waiver, but, if there was, that would not be controlling in this case, for the reason that, while the condition of the boat, after the repairs at Sturgeon Bay, probably should be held to constitute unseaworthiness, yet this case does not proceed and is not to be decided upon that theory alone, if at all. That did not necessarily constitute a breach of warranty, resulting in the right to forfeit the contract of insurance, and the contract of insurance was not forfeited thereby. The condition occurred by reason of the carelessness and negligence of the owner after the time insurance had commenced to run, and constituted a liability which the underwriters' undertaking did not cover, and, if the damage had not arisen from that cause, but from some other cause within the terms of the policy, the insured would still have been liable.

In Union Ins. Co. v. Smith, 124 U. S. 405, at page 427, 8 S. Ct. 534, 546 (31 L. Ed. 497), the court said:

"A defect of seaworthiness, arising after the commencement of the risk, and permitted to continue from bad faith or want of ordinary prudence or diligence on the part of the insured or his agents, discharges the insurer from liability for any loss which is the consequence of such bad faith, or want of prudence or diligence; but does not affect the contract of insurance as to any other risk or loss covered by the policy and not caused or increased by such particular defect. American Ins. Co. v. Ogden, 20 Wendell [N. Y.] 287; Peters v. Phœnix Ins. Co., 3 Serg. & Rawle [Pa.] 25; Paddock v. Franklin Ins. Co., 11 Pick. [Mass.] 227; Starbuck v. New England Marine Ins. Co., 19 Pick. [Mass.] 198; Adderly v. American Mutual Ins. Co. [Fed. Cas. No. 75] Taney's Dec. 126; Copeland v. New England Marine Ins. Co., 2 Metc. [Mass.] 432; Capen v. Washington Ins. Co., 12 Cush. [Mass.] 517; Merchants' Mutual Ins. Co. v. Sweet, 6 Wis. 670; Hoxie v. Pacific Mutual Ins. Co.,

7 Allen [Mass.] 211; Rouse v. Ins. Co. [Fed. Cas. No. 12,089] 3 Wall. Jr. C. C. 367."

[10] The trust company was one of the assured, and was the owner of a mortgage for $40,000 upon the Clyde. It was at all times in touch with the movement and misfortunes of the Clyde; yet it did not join in the abandonment nor in any way indicate its willingness to protect the underwriters, should they accept the abandonment. We are of opinion that it should have joined in the abandonment. Northwestern Transp. Co. v. Cont. Ins. Co. (C. C.) 24 F. 171; 2 Phillips on Ins. § 1516; Bidwell v. Northwestern Ins. Co., 19 N. Y. 179. We find nothing to the contrary in Ins. Co. of North America v. Johnson, 70 F. (6th C. C. A.) 794, 17 C. C. A. 416.

We are of opinion that the decree should be, and it is, affirmed.