## THE TEXAS NO. I.

## EGGERS v. NATIONAL UNION FIRE INS. CO.

### No. 9367.

Circuit Court of Appeals, Fifth Circuit.

June 13, 1940.

Rehearing Denied July 24, 1940.

T. G. Schirmeyer, of Houston, Tex., for appellant.

Chilton Bryan, of Houston, Tex., and Jos. M. Rault and Benjamin W. Yancey, both of New Orleans, La., for appellee.

Before SIBLEY, HUTCHESON, and McCORD, Circuit Judges.

McCORD, Circuit Judge.

E. Eggers, owner of the steel tank barge Texas No. 1 brought a libel against National Union Fire Insurance Company to recover on a policy of marine insurance for the foundering and loss of the barge in the Gulf of Mexico off Freeport, Texas. The court found the issues in favor of National Union Fire Insurance Company and dismissed the libel. Eggers, the libelant, has appealed.

The Texas No. 1 was 130 feet long, 20 feet wide, and her main tanks were 6 feet 2 inches deep. She was designed to carry oil on inland waters and was without means of self-propulsion.

On October 29, 1937, National Union Fire Insurance Company issued its policy of marine insurance for $5,000 covering the barge. When the policy was issued the Texas No. 1 was lying in the channel at Houston, Texas. The policy provided among its many stipulations and agreements that the insurance covered losses by perils of the seas and, by the Inchmaree clause, losses resulting from the negligence of the master, charterer, or mariners. It contained the warranty that at all times during the continuance of the policy the barge would be kept in a seaworthy condition. The warranty of seaworthiness was qualified by the Inchmaree clause in that the Insurance Company insured against loss caused by latent defects in the hull of the barge, provided such loss had not resulted from want of due diligence on the part of the owners or managers of the barge.

It was the purpose of the owner and charterer of the Texas No. 1 to tow it from Houston to Port Lavaca to be repaired and thereafter used for the transportation of oil on the inland waters of Louisiana and Texas and the Intercoastal Canal. These limits were extended by endorsement on the policy to allow the barge to make the outside trip from Houston to Port Lavaca and return to Houston at the end of its service. A $50 additional premium was charged for this outside passage in the gulf. It was further provided that in the event there was not a return trip of

the barge from Port Lavaca a premium refund of ½%, $25, would be given.

In the endorsement it was also provided that "* * * Warranted only one (1) vessel in tow on trip to and from Port Lavaca. Warranted barge, tug, towing arrangements and weather conditions (prior to sailing) being approved by U. S. Salvage Association or other Surveyor satisfactory to this company, at the Assured's expense."

United States Salvage Association made an inspection for the parties under the terms of the policy before the barge was towed from Houston to Port Lavaca. The certificate of inspection showed that the Texas No. 1 was an old steel barge built twenty-five years ago and rebuilt ten years later; that she was in a very bad condition and not a desirable marine risk; that about five hundred rivets in the deck plating were wasted; that the bottom was set up in several places and slightly waved; that the frames were set in on both sides; that the floors were set up; and that the deck beams were wasted in places. When the barge reached Port Lavaca she was to be inspected by a government inspector so that a permit might be granted for the transportation of inflammable oils.

After the Salvage Association had made its inspection of the barge prior to the first sailing it inspected the tug Saluria which was to tow the barge on the outside passage. It also inspected and approved the towing gear and ascertained and approved the weather conditions. The barge was then towed through the gulf to Port Lavaca. When it reached Port Lavaca it was anchored for several days and was then hauled out onto the marine railway where the government inspector examined her to see if she was in proper condition to haul oil in her tanks. This inspection disclosed that the barge was in very bad shape and the inspector refused to issue a cargo permit unless and until the much needed repairs were made. At first the repairs were attempted but because of the expense involved repairs were abandoned and Eggers, the owner, ordered the barge towed back to Houston. Prior to this return voyage no inspection was made by the Salvage Association or by anyone agreed upon by the parties as required by the terms of the contract of insurance. Wade, the charterer, after investigating weather conditions, ordered the tug Saluria to immediately tow the barge to Houston.

On the return trip to Houston the tug Saluria developed engine trouble off the coast of Freeport. The tug with barge in tow anchored for the night. During the night while so anchored the barge foundered and went down and was a total loss. Proper and timely notice of the loss was given the Insurance Company but it declined to pay the claim.

The evidence is, without dispute that the barge was insured, inspected, and given permission to be towed to Port Lavaca. Moreover, if it had foundered on the first voyage and had been lost we think it clear that the insurer would have been liable. Cf. Compania De Navegacion v. Fireman's Fund Ins. Co., The Wash Gray, 277 U.S. 66, 48 S.Ct. 459, 72 L.Ed. 787. Certain it is that the liability of the Insurance Company extended to and included the entire time the barge was anchored, removed to dry dock, and inspected by the government inspector at Port Lavaca. This latter inspection was not made to ascertain the seaworthiness of the barge but it did develop that the barge was in very bad condition and unfit to haul and transport oil or other inflammable liquids. The inspector gave his opinion that the barge was unseaworthy, and three disinterested witnesses, experienced in such matters, testified that the barge was not seaworthy.

It is without dispute that the permit to haul oil was denied unless much needed repairs were made and that Eggers declined to make the repairs. When he ordered the barge to be towed back to Houston he knew she was not seaworthy. This knowledge was brought home to him. The defects in the barge were not latent; they were not only pointed out by the inspector and others, they were patent and the markings of the inspector pointed to them. The insured did not have an inspection made and did not have weather conditions and towing arrangements approved by a disinterested inspector, but knowing the true condition of his barge he ordered her to be towed out to sea. In this he violated an express warranty of the policy. Shamrock Towing Co. v. American Ins. Co., 2 Cir., 9 F.2d 57; Aetna Ins. Co. v. Houston Oil & Transport Co., 5 Cir., 49 F.2d 121.

The contention that the Texas No. 1 was lost as the result of a storm and heavy seas appears to be an afterthought. The storm and high seas were not mentioned for nearly nine months and recovery was

first sought on latent defects in the hull and under the Inchmaree clause.

Negligence is not to be imputed to the master and personnel of the tug Saluria. The tug rode out the alleged storm and the evidence leads to the unalterable conclusion that the real and only cause of the foundering and loss of the Texas No. 1 was her unseaworthiness. When the insured ordered her towed into the gulf, knowing of her defects, he violated an express warranty of the policy and the tow was at his peril. The question of adjustment of premiums is not before us. New Orleans T. M. Ry. Co. v. Union Marine Ins. Co., 5 Cir., 286 F. 32; Western Assur. Co. v. Shaw, 3 Cir., 11 F.2d 495.

The judgment is affirmed.