## PRUDENTIAL INS. CO. OF AMERICA v. GILROY.

### No. 11555.

Circuit Court of Appeals, Fifth Circuit.

April 5, 1946.

---

L. S. Julian, of Miami, Fla., for appellant.

P. N. Hiatt and Abe Aronovitz, both of Miami, Fla., for appellee.

Before SIBLEY, WALLER, and LEE, Circuit Judges.

LEE, Circuit Judge.

The Prudential Insurance Company, on August 4, 1939, delivered to Murray G. Gilroy two $5,000 policies of insurance on his life, payable to his wife, Dorothea Gilroy. Premiums were payable monthly on the 4th day of each month. Beginning with September, 1939, and continuing through July, 1942, the monthly payments were $54.30; thereafter the monthly payments were $62.-80. At the death of the insured on January 6, 1944, the insurance company refused payment on the ground that the policies had lapsed for nonpayment of the monthly premiums due on February 4, 1943, and that their nonforfeiture provisions which utilized their cash surrender values less certain outstanding loans extended the policies only until November 15, 1943. Mrs. Gilroy, as beneficiary, thereupon brought suit for $9,568.90 (the principal sum, $10,000, of both policies less the loan indebtedness), with legal interest and reasonable attorney's fees. From a judgment for the amount demanded, the insurance company appealed.

The sole question is whether the policies were in force when the insured died. The answer depends on whether binding premium payments alleged to have been made were actually made, viz.: A payment by the insured on July 8, 1942, in the sum of $54.30 for premiums due on July 4, 1942, and premium payments on September 1, 1942, in the sum of $108.60.

With reference to the first alleged payment, Mrs. Gilroy testified that in July, 1942, J. R. Evans, an authorized representative of the insurance company, collected from the insured premiums due on June 4, 1942, and on July 4, 1942, and issued a receipt bearing date July 6 and a receipt bearing date July 8 for the two payments. The receipt dated July 8, 1942, purported to evidence a payment to Evans by the insured of $54.30, for "premiums due for the month of July, 1942." Although Evans testified the receipt was apparently in his handwriting with the exception of the figure "42" designating the year, he denied receiving the money and stated that on July 8, 1942, he spent the day in the company's district office in Miami. He also testified that when he attempted to collect the premiums due on July 4, 1942, in the latter part of July, Mr. and Mrs. Gilroy said they were not financially able to make further premium payments, and that at his suggestion the insured, on August 14, 1942, filed with the insurance company applications to reinstate each policy and applications for a loan on each policy. In the applications for reinstatement the insured stated that the policies had lapsed for nonpayment of the monthly premiums due on July 4, 1942, and in the applications for loans, directed that the company should apply the proceeds of the loans to the monthly premiums due on July 4, 1942 and on the 4th of each of the six subsequent months. On August 28, 1942, the insurance company approved the applications for reinstatement and for loans; and the proceeds of the loans were applied to pay the July 4, 1942, premiums and the premiums due on the 4th of each of the subsequent months to and including January 4, 1943.

It is undisputed that when M. J. Breitbart, another authorized representative of the insurance company, was in Gilroy's place of business on September 1, 1942, Mr. or Mrs. Gilroy in anticipation of a vacation trip asked him to receive premium payments. After Breitbart ascertained by telephone to his office that two months' premiums would be $108.60, either Mr. or Mrs. Gilroy paid Breitbart $108.60, and took a "temporary" receipt. Breitbart the next day deposited said amount in the insurance company's district office as a payment due by Mr. Gilroy on premiums on the two policies, and on the back of an "advance payment ticket" indicated that Mrs. Gilroy had made the payment. A day later the cashier in the district office discovered that the proceeds of the loans had paid the premiums on the policies through January, 1943. She also noticed that due to the increase in the premium rate on August 4, 1942, two months' premiums on both policies totaled $125.60 instead of $108.60. Breitbart, being notified, requested that the $108.60 be returned to Mrs. Gilroy. On September 4, 1942, the insurance company sent Mrs. Gilroy a check for that sum without any explanation except the check bore the number of one of the policies. At the time, Mrs. Gilroy was in the state of New York, and,

though the check was forwarded to her there, she did not cash it until her return to Miami some weeks later. She testified at the trial that she thought the check was a dividend on policies which she carried with the company; that she did not know it was the return of the sum which Breitbart had collected; and that her husband never knew she received the check.

It is also undisputed that the insurance company on March 20, 1943, sent a notice of the lapse of the two policies to Mr. Gilroy for failure to pay the monthly premiums due on February 4, 1943, and that some days later the company's assistant cashier explained to him the possibility of reinstatement of the policies. In this conversation Mr. Gilroy said that since he was not financially able to carry the policies "they would have to go."

The court below found that the insurance company accepted the payment of $108.60 made to Breitbart on September 1, 1942; that if the insurance company did not apply the payments to the policies, the duty rested upon it to obtain the consent of Mr. Gilroy to the refund even though Mrs. Gilroy had made the payment; that Mrs. Gilroy was ignorant of the source of the funds represented by the check, and she in good faith accepted and cashed it; and that Mr. Gilroy never knew the premiums were refunded to her.

After the trial the insurance company submitted a photostatic copy of the receipt dated July 8, 1942, to a handwriting expert. The production of the receipt only two days before the trial [1] had not afforded the company a previous opportunity to do so. The expert, in an affidavit, swore that neither the signature to the receipt nor the body of the receipt was in the handwriting of Evans. The company then filed a motion for a new trial on the ground of newly discovered evidence. The court denied the motion and stated as its reason for so doing that proof of the forgery would not destroy the effect of the $108.60 premium payment on September 1, 1942. The court said:

"If the second payment made upon the two policies in question [referring to the payment in the sum of $108.60] was a valid and binding payment, as between the insured and the insurance company, the policies were in full force and effect on the date of the death of the insured and plaintiff is entitled to recover."

In overruling the motion for a new trial we think the court below erred.

Against Mrs. Gilroy's testimony that Mr. Gilroy paid Evans on July 8, 1942, the monthly payments due July 4, 1942, and that Evans gave a receipt to him, stands evidence that the insured in his August, 1942, applications (1) stated that each policy had lapsed for failure to pay premiums due on July 4, 1942, and (2) directed the company to use the proceeds of the loans to pay the monthly premiums due on the *4th day of July* and on the 4th day of the six subsequent months.[2] Mr. Gilroy, in conversation with the assistant cashier at the district office of the insurance company, following receipt of notice that failure to pay monthly premiums due on February 4, 1943, had caused the policies to lapse, made no mention of any premium payments to Breitbart. He knew that the proceeds of the policy loans and not the $108.60 paid to Breitbart had paid the monthly premiums due on the policies to and including January 4, 1943. His failure to call attention to the payment made to Breitbart and to the fact that such payment was ample to take care of the monthly premiums due on February 4, 1943, would indicate (1) that he knew the company had refunded the $108.60 and (2) that such refund made through his wife was approved by him.

The testimony of the appellee that she did not tell her husband of the refund of the $108.60 is the only evidence in the record upon which to base the finding that the insured had no knowledge of the refund. If in her mind the $108.60 represented dividends paid by the insurance company on policies on her life,[3] then no reason existed why knowledge of it should have been kept

---

[1] In a letter to the company written shortly after the death of the insured, appellee said: "I was told by the agent if my husband had died thirty days sooner, your company would have paid my claim on these policies, or if I had paid another month's premiums I would have collected."

[2] The trial judge stated that if the case

rested on the validity of the receipt dated July 8, 1942, he would grant a new trial to examine its validity, thus indicating that he thought the attack on it was worthy of serious consideration.

[3] Appellee under cross-examination admitted that the insurance company had never before paid dividends on the policies issued to her.

from her husband. Proof that the receipt she produced to show payment of the monthly premiums due on July 4, 1942, was a forgery would seriously impair the value of her testimony and would suggest that little credence could be given her statement that her husband had no knowledge of the refund and that she was in good faith in receiving and using it. Neither the insured nor the appellee as beneficiary might knowingly receive and use the premiums refunded and then be heard to assert that such premiums kept the policies in force.

For the reasons assigned the judgment appealed from is reversed, and the cause is remanded with instruction to grant a general new trial.

Reversed and remanded.