SASKATCHEWAN GOVERNMENT IN-
SURANCE OFFICE, Appellant,

v.

SPOT PACK, Inc., Appellee.

No. 16102.

United States Court of Appeals
Fifth Circuit.

March 14, 1957.

Russell C. Gay, Miami, Fla., Gay & Woodard and Linwood Anderson, Miami, Fla., of counsel, for appellant.

Cody Fowler, Walter Humkey, Richard Ralph, Fowler, White, Gillen, Yancey & Humkey, Miami, Fla., for appellee.

Before RIVES, TUTTLE and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

Pressing successfully its claim under the quaint language, "Touching the Adventures and Perils which we, the said Underwriters, are contented to bear and take upon us, they are of the Seas, Men-of-War, Fire, Lightning, Earthquake, Enemies, Pirates, Rovers, Assailing Thieves, Jettisons, Letters of Mart and Counter-Mart, Surprisals, Takings at Sea, Arrests, Restraints, and Detainments of all Kings, Princes and Peoples, of what nation, condition or quality soever, Barratry of the Master and Mariners and of all other like Perils, Losses and Misfortunes that have or shall come to the Hurt, Detriment or Damage of the said Vessel, &c., or any part thereof * * *," for destruction of the fishing vessel M/V Spot Pack by fire at sea, the Owner Spot Pack, Inc., now resists the appeal by the Underwriters.

The Underwriter's appeal rests primarily on the assertion that while the District Court's judgment of liability was initially wrong and ought to have been reversed in any event, it became positively so when the motion for new trial under Fed.Rules Civ.Proc. rules 59 and 60, 28 U.S.C.A. demonstrated that false testimony had been given on material points by several witnesses, so that overruling of that motion, a matter normally beyond appellate review, became one of such abuse of discretion[1] as to be tested and corrected by us.

Fire, being so definitive and here so decisive, eliminated the sometime troublesome matter of proving damage from an insured peril.

The case narrowed down then to the Underwriter's defense that the Owner "breached the terms of the policy in that the said loss and/or damage was caused from the want of due diligence by the assured, the owners or managers of the vessel." By contention, argument and evidence, F.R.C.P. 15(b), the "want of due diligence" was expanded to lack of diligence in making the vessel seaworthy. Specifically, the claimed unseaworthiness was putting to sea with no circuit breaker between the starboard generator and the main electric switchboard panel.

The Trial Court found that the vessel "could properly operate without the starboard circuit breaker" because she was "equipped with three fuses on each main line between the two generators and the panel * * *." By detailed motion for new trial, F.R.C.P. 59, 60, with supporting affidavits, the Underwriter asserted that the testimony that there were fuses in addition to the circuit breaker was patently untrue and false and contrary to pretrial depositions from the Master, Engineer and Electrical Contractor. Without resolving the question of whether there had been, as charged, false, untrue swearing or testimony, the Court overruled the motion.[2]

1. The Underwriter relies heavily on Commercial Credit Corp. v. Pepper, 5 Cir., 187 F.2d 71; Prudential Ins. Co. of America v. Gilroy, 5 Cir., 154 F.2d 382; Ferrell v. Trailmobile, Inc., 5 Cir., 223 F.2d 697.

The assured stresses English v. Mattson, 5 Cir., 214 F.2d 406, and others, F. W. Woolworth Co. v. Seckinger, 5 Cir., 125 F.2d 97; Brown v. Schwartz, 5 Cir., 164 F.2d 151; Davis v. Yellow Cab Co. of St. Petersburg, 5 Cir., 220 F.2d 790.

2. The Order recited consideration of the motion and supporting material and that the Court was, "of the opinion that the motion should be denied for the reasons that an examination of the matters which the Defendant would seek to introduce into evidence at a new or re-opened trial is either incompetent, cumulative, or im-

We follow this same tack. For in our view, this asserted unseaworthiness was neither ground for avoiding the policy as a breach of warranty nor as the established cause of the destructive fire.

The M/V Spot Pack, a converted Navy AMC minesweeper, had two diesel-driven generators, port and starboard. Installed originally to supply power for exploding magnetic mines, these generators supplied the power for all of the auxiliaries and the extensive refrigerated spaces needed and installed for the catch. She had, from September 1953 to March 1954, undergone extensive repairs at a Miami shipyard consequent upon a fire in her engine room. Extensive renewals, replacements and repairs to the electrical system were made. She left shipyard on March 17, 1954, bound for her first fishing voyage to Campeche Banks in a condition characterized, without dispute, by acknowledged experts as completely seaworthy. While going down the coast, the Engineer noticed that the magnetic coil of the starboard circuit breaker between the starboard generator and the panel was overheating badly. When the vessel put in at Key West, the Master reported this to the Owner's president by long distance. The Owner relayed this by telephone to the Electrical Contractor who had performed all of the electrical work in the shipyard. The contractor unequivocally informed the Owner that it would be all right and safe to operate with the circuit breaker out and bridged over and requested that it be removed, taken ashore and sent to them for overhaul, which was done. The Owner, by long distance, relayed to the Master the contractor's assurances that the vessel could be operated safely in the interim.

The vessel then proceeded to the Banks and after a poor catch, returned a few weeks later to Key West where, on receipt of information from the Owners that it, repaired and ready for installation, was then ashore, the circuit breaker was redelivered to the ship. The Master and Engineer, each licensed, experienced and of undisputed competence, after some consideration decided that, while reinstallation could easily be done within a few hours by the Engineer, it would be more convenient (and less arduous for them, no doubt) to wait until the vessel next returned to Miami where it would be done by an electrical contractor.

The vessel, with the repaired circuit breaker aboard, but uninstalled, then put to sea for a short fishing voyage during which both port and starboard generators, as on the Campeche trip, were alternately used without reported difficulty. On return, a few days later, to Key West, the Master, reporting by long distance to the Owners concerning the voyage, informed the Owner that some difficulty had been encountered with the refrigeration, but there is absolutely no evidence that the Owner was informed or knew then, or later, that the circuit breaker had not been reinstalled.

Within a few days she departed on her last voyage with the circuit breaker aboard, but uninstalled. In the darkness of April 28, 1954, with the starboard generator operating, but with no one in the engine room since she was wheelhouse controlled, the automatic bilge alarm rang, and immediately heavy smoke was seen pouring out of the engine room. Fire and smoke cut off access to the engine room and under deck spaces. Abandoned in a matter of hours, she burned to the water's edge and sank, carrying to her watery grave whatever evidence there might have been as to the source or cause of the fire, the place or location of its origin, and, if from electrical equipment, whether it was the generators, port or starboard, or anyone of the innumerable auxiliaries or their circuits. The only circumstantial telltale identified by evidence as a likely indication of a generator being overloaded (and for which a circuit breaker would trip or a main fuse blow)—a noticeable

peaching, and the Court is further of the opinion that the Defendant has proffered no new matters which indicate that manifest injustice or a failure of justice would

result if a new trial is not granted, or that [sic] would be a different result if a new trial is granted * * *."

dimming of the vessel's lights—did not occur.

■ Assuming that prudent management required a circuit breaker in the line, it would be the sheerest guesswork to say that fire started in the starboard generator or in any part of the electrical system because of the absence of the circuit breaker. And had such a finding been made initially or on the requested rehearing, it would have foundered as clearly erroneous, United Geophysical Co. v. Vela, 5 Cir., 231 F.2d 816; Galena Oaks Corporation v. Scofield, 5 Cir., 218 F.2d 217.

This inexorable finding is decisive for, unlike Continental Insurance Co. of City of New York v. Patton-Tully Transportation Co., 5 Cir., 212 F.2d 543, 1954 A.M.C. 889; Ideal Cement Co. v. Home Insurance Co., 5 Cir., 210 F.2d 937, 1954 A.M.C. 663, and Hanover Fire Insurance Co. v. Holcombe, 5 Cir., 223 F.2d 844, 1955 A.M.C. 1531, certiorari denied 350 U.S. 895, 76 S.Ct. 154, 100 L.Ed. 787, where each policy contained an express warranty of continuing seaworthiness which was patently breached thus giving the double-bottomed defense of avoidance of the whole policy and a negation of damage from an insured peril, the insurance contract on the M/V Spot Pack, under an American Institute Time (Hulls) form for the period February 22, 1954 to February 22, 1955 was completely silent on warranties of seaworthiness. If seaworthiness was an ingredient of the contract, it has to be implied and, more important, the *time* the implied warranty attaches and its scope must be fixed.

■ The English Rule is clear that in a Time Hull policy such as this one, there is no " * * * warranty that the vessel at any particular time shall have been seaworthy * * * " but "If, however, through the personal misconduct of the owner, the ship be sent to sea in an unseaworthy state, he cannot recover for a loss brought about by such wilful act or default." 2 Arnould, Marine Insurance (13th Ed. 1950), § 697, pp. 637–638.

But the American Rule, in a rare departure from a determined course of parallel uniformity, Queen Ins. Co. of America v. Globe & Rutgers Fire Ins. Co., 263 U.S. 487, 44 S.Ct. 175, 68 L.Ed. 402, implies for a time policy, as does the English Rule as of the commencement of the voyage for voyage policies, 2 Arnould, op. cit. supra, §§ 691, 695, a warranty of seaworthiness as of the very moment of attachment of the insurance. And, unlike the English Rule which limits the warranty to the commencement of the voyage, the American Rule takes it somewhat further to extend, in point of time, a sort of negative, modified warranty. It is not that the vessel shall continue absolutely to be kept in a seaworthy condition, or even that she be so at the inception of each voyage, or before departure from each port during the policy term. It is, rather, stated in the negative that the Owner, from bad faith or neglect, will not knowingly permit the vessel to break ground in an unseaworthy condition. And, unlike a breach of a warranty of continuing seaworthiness, express or implied, which voids the policy altogether, the consequence of a violation of this "negative" burden is merely a denial of liability for loss or damage caused proximately by such unseaworthiness.

How this came to be the rule of general acceptance for all Time policies is obscure, for traced as it apparently is to expressions[3] in Union Insurance Co. of

---

**3.** 124 U.S. at page 427, 8 S.Ct. at page 546, 31 L.Ed. at page 506: " * * * In the insurance of a vessel by a time policy, the warranty of seaworthiness is complied with if the vessel be seaworthy at the commencement of the risk, and the fact that she subsequently sustains damage, and is not properly refitted at an intermediate port, does not discharge the insurer from subsequent risk or loss, provided such loss be not the consequence of the omission. A defect of seaworthiness, arising after the commencement of the risk, and permitted to continue from bad faith or want of ordinary prudence or diligence on the part of the insured or his agents, discharges the insurer from liability for any loss which is the con-

Philadelphia v. Smith, 124 U.S. 405, 8 S. Ct. 534, 31 L.Ed. 497, there seems to have been slight critical awareness that the policy in Union contained not alone an express warranty of seaworthiness, but an express exclusion of losses caused by unseaworthiness or by incompetence of Master and Mariners, which might imply a contractual undertaking for a continuing obligation by Master and crew members acting generally as agents for the owners to take all prudent requisite steps to keep the ship seaworthy. But we need not determine whether, and to what extent, the rules should be different for a Time policy, as the one here, carrying, at most, an implied warranty, for the Underwriter cannot meet the demands of the Union standard.

First, having the burden not only of proving unseaworthiness, Hanover Fire Insurance Co. v. Holcombe, supra, 21 Appleman, Insurance Law and Practice, § 12237, p. 120 (1947), but that such unseaworthiness (i. e., departing with

circuit breaker uninstalled) was the cause of the loss, New York & Porto Rico S.S. Co. v. Aetna Insurance Co., supra; Henjes v. Aetna Insurance Co., supra, the Underwriter failed to sustain this burden.

Second, and of equal importance, assuming that departure with the circuit breaker uninstalled made the vessel unseaworthy, the proof shows nothing more than negligence on the part of the Master, Engineer and crew in failing to use the simple means at hand to make her seaworthy. New York & Porto Rico S.S. Co. v. Aetna Ins. Co., supra. When Union speaks in terms of "bad faith or want of ordinary prudence or diligence on the part of the insured or his agents," it refers to those acts in which the owner, if an individual, personally participates, or if a corporation or multiple ownership, in which there is personal participation by those having shoreside managerial responsibilities. Consistent with the general pattern of

sequence of such bad faith, or want of prudence or diligence; but does not affect the contract of insurance as to any other risk or loss covered by the policy, and not caused or increased by such particular defect. [American] Ins. Co. v. Ogden, 20 Wend. [N.Y.] 287; Peters v. Phoenix Ins. Co., 3 Serg. & R. [Pa.] 25; Paddock v. [Franklin] Ins. Co., 11 Pick. [Mass.] 227; Starbuck v. [New Eng. Mar. Ins. Co.] 19 Pick. [Mass.] 198; Adderly v. [American Mut.] Ins. Co. [Fed.Cas. No.75], Taney 126; Copeland v. [New Eng. Mar.] Ins. Co., 2 Met. [Mass.] 432; Capen v. [Washington] Ins. Co., 12 Cush. [Mass.] 517; [Merchants' Mut.] Ins. Co. v. Sweet, 6 Wis. 670; Hoxie v. [Pacific Mut.] Ins. Co., 7 Allen [Mass.] 211; Rouse v. Ins. Co. [Fed.Cas.No. 12 089], 3 Wall.Jr. 367."

New York & Porto Rico S.S. Co. v. Aetna Insurance Co., 2 Cir., 204 F. 255, 258, expressed a like concern over the origin of the rule: "* * * The law in England seems to be very clear that there is no implied warranty of seaworthiness in the case of time policies. Gow on Marine Insurance, 272. On the other hand, our courts seem to take the view that although there may be no implied warranty of seaworthiness, still if the vessel is in a port where repairs may be made, or equipment and supplies obtained, the insured cannot recover for any loss

caused by the want of due diligence in making repairs and obtaining equipment or supplies. * * * Mr. Justice Blatchford in Union Insurance Co. v. Smith, 124 U.S. 405, 427, 8 S.Ct. 534, 31 L.Ed. 497, seems to have assumed that there is an implied warranty at the beginning of the risk under a time policy. The observation was not necessary to the decision of the case, because the policy under consideration contained an express exception of losses caused by unseaworthiness. As to losses subsequently occurring, he held that want of ordinary prudence or diligence in keeping the vessel seaworthy would relieve the underwriters, not absolutely, but only of liability for damage caused by such negligence * * *."

And see in Henjes v. Aetna Insurance Co., 2 Cir., 132 F.2d 715, 719, certiorari denied 319 U.S. 760, 63 S.Ct. 1316, 87 L. Ed. 1711, 1943 A.M.C. 27, "* * * There is in the United States an implied warranty by the insured in a time marine policy that the ship is seaworthy at the time the policy period begins. Union Insurance Co. v. Smith, 124 U.S. 405, 427, 8 S.Ct. 534, 31 L.Ed. 497. But that is true only when the vessel is in port at the time. New York & P[orto] R[ico] S.S. Co. v. Aetna Ins. Co., 2 Cir., 204 F. 255. When the insurance is to come into being on a ship on a voyage the insurer takes her as she may be * * *."

legislative and judge-made admiralty law which, to encourage and foster shipping and maritime ventures, Hartford Accident & Indemnity Co. of Hartford v. Southern Pacific Co., 273 U.S. 207, 47 S.Ct. 357, 71 L.Ed. 612, 1927 A.M.C. 402; Just v. Chambers, 312 U.S. 383, 61 S.Ct. 687, 85 L.Ed. 903, 1941 A.M.C. 430, distinguishes between acts of those in supervisory management and in normal operation, an insurance policy, as a contract made in that general atmosphere to meet the business needs of the shipping industry, should receive a parallel construction that neglect by agents or servants below the level of management will not be imputed on the usual notions of *respondeat superior*.[4] In such a Time policy, it is only " * * * where, with the *privity of the assured*, the ship is sent to sea in an unseaworthy state [that], the insurer is not liable for any loss attributable to unseaworthiness," Compania Transatlantica Centroamericana, S. A. v. Alliance Assurance Co., D.C.S.D.N.Y., 50 F.Supp. 986, 991, 1943 A.M.C. 976, 983.

Of course, in this analysis, we disregard altogether the negligence of the Master and Engineer, for fire, being a definite peril and the incontestable cause of the loss, is not the less covered because brought about or caused by such negligence. Orient Mutual Insurance Co. v. Adams, 123 U.S. 67, 8 S.Ct. 68, 31 L.Ed. 63; Columbia Insurance Co. of Alexandria v. Lawrence, 10 Pet. 507, 35 U.S. 507, 9 L.Ed. 512; Waters v. Merchants'

Louisville Insurance Co., 11 Pet. 213, 36 U.S. 213, 9 L.Ed. 691; and Patapsco Ins. Co. v. Coulter, 3 Pet. 222, 28 U.S. 222, 7 L.Ed. 659.

█ How then was the Owner charged with this neglect? The evidence, both admitted and that tendered in the affidavits supporting the motion for new trial, is completely silent showing actual knowledge. And so it is of circumstances from which a Court might infer such knowledge. The Underwriter's answer to this is substantially that the Owner was guilty of an independent personal fault (i. e., with its privity) in not ascertaining whether the circuit breaker had been reinstalled. Of course, the implications of this are far-reaching for it reflects the temptation, which the marvels of science—the telephone, radio, easy access by airplane—make so alluring, to navigate and manage a vessel, not from her bridge through the eyes, ears, and judgment of the Master and those in his command, but from the security of a swivel chair in some remote skyscraper office. A Master is not one in name alone. He is Master in fact and commander of his ship, United Geophysical Co. v. Vela, supra; Ionion Steamship Co. of Athens v. United Distillers of America, Inc., 5 Cir., 236 F.2d 78, 83, 1956 A.M.C. 1750, and if Courts succumb to the beguiling paternalistic plea that someway, somehow, the Owner ought to have checked to see if a duty was fulfilled, responsibility, thus divided, is undermined.

4. See, e. g., Limitation of Liability, 46 U.S.C.A. §§ 182, 183–189 and especially the 1936 Amendments to § 183(e) making knowledge of the Master "privity or knowledge of the owner" in personal injury and death claims. Robinson, Admiralty, § 124, pp. 941–950 (1939). Mere negligence is not imputed on basis of *respondeat superior*, and must be chargeable personally to the owner, not merely agents: LaBourgogne, 210 U.S. 95, 122, 28 S.Ct. 664, 52 L.Ed. 973; Providence & N. Y. S.S. Co. v. Hill Manufacturing Co., 109 U.S. 578, 3 S.Ct. 379, 27 L.Ed. 1038; unseaworthiness may be without owner's fault and privity: The Republic, 2 Cir., 61 F. 109; cf. The Galileo, 2 Cir., 54 F.2d 913, 1932 A.M.C. 1,

affirmed Earle & Stoddart v. Ellerman's Wilson Line, 287 U.S. 420, 53 S.Ct. 200, 77 L.Ed. 403, 1933 A.M.C. 1, and The Maria, 4 Cir., 91 F.2d 819, 823, 1937 A.M.C. 934 which set forth the distinction between owner's privity and fault and Harter Act, 46 U.S.C.A. § 192 situations; for a corporate owner knowledge must be that of managing officers or persons of like responsibilities: Craig v. Continental Ins. Co., 141 U.S. 638, 12 S.Ct. 97, 35 L.Ed. 886; Spencer Kellogg & Sons v. Hicks (The Linseed King), 285 U.S. 502, 52 S.Ct. 450, 76 L.Ed. 903, 1932 A.M.C. 503; Coryell v. Phipps, 317 U.S. 406, 63 S.Ct. 291, 87 L.Ed. 363, 1943 A.M.C. 18, affirming 5 Cir., 128 F.2d 702, 1942 A.M.C. 906.

Specifically, what reason was there why the Owner should have anticipated that the competent Master would not have required the competent Engineer to perform this simple task? None save the assumption that it was of such extraordinary importance to the safety of the vessel that the Owner should have taken special pains. But if this were important, then what about bunkers, galley stores, slop chest, navigation charts, radio equipment, and hiring the hands who go down to the sea in ships? And if the Master's performance was to be checked, who was to check the checker?

This plea, as here made, would reduce a Master of undoubted competence to an inferior, subordinate functionary. The record affords no basis for denying that the Owner was entitled to assume that he would do his duty.

■ Finally, the Underwriter, seeking to shore up its claim of a running, continuing obligation to use due diligence to keep the vessel seaworthy and unable to find words remotely suggesting "due diligence" elsewhere in the policy, insists that the Inchmaree Clause[5] expressly states it. But this is to read that Clause as a restriction of coverage and to ignore its rich history which reveals it and its several expansive amendments as the underwriters' response to the practical business needs of the shipping world in the face of adverse court decisions. As such, its purpose is to broaden, not restrict, to expand, not withdraw, coverage.[6]

Indeed, the Clause is aid and comfort, not to the Underwriter, but to the Owner. It supplies additional perils "Touching the Adventures * * * which * * * the * * * Underwriters, are contented to bear and take upon" themselves. Here, specifically, if the fire was, in a legal sense, the proximate result of the imprudent failure to reinstall the circuit breaker, it was plainly "Negligence of Master * * * Mariners, [or] Engineers * * *." And if, as claimed, the fire was immediately caused by an overloaded circuit or generator, it comes within the precise terms of "loss of or damage to the [vessel] * * * caused by * * * Breakdown of motor generator or other electrical machinery and electrical connections thereto * * *,"[7] a specific item of coverage purposely added within the past few years to expand protection of the policy.

---

5. "This insurance also specially to cover (subject to the Average Warranty) loss of or damage to the subject matter insured directly caused by the following:—
"Accidents in loading, discharging or handling cargo, or in bunkering;
"Accidents in going on or off, or while on drydocks, graving docks, ways, gridirons or pontoons;
"Explosions on shipboard or elsewhere;
"Breakdown of motor generators or other electrical machinery and electrical connections thereto, bursting of boilers, breakage of shafts, or any latent defect in the machinery or hull, (excluding the cost and expense of replacing or repairing the defective part);
"Contract with Aircraft or with any land conveyance;
"Negligence of Master, Charterers other than an Assured, Mariners, Engineers or Pilots;
"Provided such loss or damage has not resulted from want of due diligence by the Assured, the Owners or Managers of the Vessel, or any of them. Masters, Mates, Engineers, Pilots or Crew not to be considered as part owners within the meaning of this clause should they hold shares in the Vessel."

6. Inaugurated to overcome the decision of the House of Lords in Thames & Mersey Marine Insurance Co. v. Hamilton Fraser & Co., 12 App.Cas. 484 (1887), it takes its name from the Steamship Inchmaree involved in that case. The origin and development of the Clause is interestingly traced in the Arbitration opinions of John C. Prizer, National Bulk Carriers, Inc., S.S. Pan Massachusetts v. American Marine Hull Insurance Syndicate, 1949 A.M.C. 340, and of Claude E. Wakefield, Thibert, Owner of the Diesel Tug Dusty v. Union Insurance Society of Canton, Ltd., 1951 A.M.C. 1661, and the fascinating opinion of Judge Carter in Ferrante v. Detroit Fire & Marine Insurance Co., D.C.S.D.Cal., 125 F.Supp. 621, 1954 A.M.C. 2026.

7. Technically, the cost of replacing the offending part, i. e., the one causing the

Neither of these sweeping covers, on this record, is shrunk by the Proviso, note 5, supra, "Provided such loss or damage has not resulted from want of due diligence by the Assured, the Owners or Managers of the Vessel, or any of them * * *." By its language, context, purpose and specific terms which exclude the Master and crew members from the status of "owners" even though they, in fact, own interests in the vessel, this, as in the discussion of the Union rule above, refers only to acts [8] of which the owner has privity and knowledge.

The Inchmaree Clause adds a further thing of significance: to the extent that there is an implied undertaking that the vessel is not knowingly being sent to sea in want of equipment or repairs, note 3, supra, it is further reduced in scope if such unseaworthiness arises from the "Negligence of Master * * * Mariners, Engineers or Pilots." For this and other causes set forth in the Clause, e. g., latent defects, qualifies the implied warranties. Eggers v. National Union Fire Insurance Co., 5 Cir., 112 F.2d 541, 1940 A.M.C. 1106.

The finding of liability was fully supported and the matters urged on the motion for new trial were utterly immaterial. The judgment was right.

Affirmed.

fire, would likely be excluded, see notes 5 and 6, and Mellon v. Federal Insurance Co., D.C.N.Y., 14 F.2d 997. This might have been as inconsequential as a short piece of wire, a defective switch, electric motor driving a refrigerator compressor, defective fuse, insulation, or the like. Neither party sought to pinpoint this nor is any complaint made of it by the Underwriter on this appeal.

8. If the negligent act is that of the Master, or of a Mariner, or an Engineer during the existence of his employment as a member of the ship's company, it meets the plain words of the Clause and subjects the Underwriter to liability for consequential damage. We consider unsound those cases in the wake of Merchants' Mutual Insurance Co. v. Sweet, 6 Wis. 670, and The Rendezvous, Read v. Agricultural Ins. Co., 219 Wis. 580, 263 N.W.

632, 1936 A.M.C. 25, see, e. g., Leathem Smith-Putnam Navigation Co. v. National Union Fire Insurance Co., 7 Cir., 96 F. 2d 923, 1938 A.M.C. 842; Chicago Steamship Lines v. United States Lloyds, 7 Cir., 12 F.2d 733, 1926 A.M.C. 807, certiorari denied 273 U.S. 698, 47 S.Ct. 94, 71 L. Ed. 846; Baggaley v. Aetna Insurance Co., 7 Cir., 111 F.2d 134, 1940 A.M.C. 583; and Arbitration Opinion of Robert Branand, Jr., Yacht Buccaneer, 1940 A.M.C. 1397, in so far as they attempt to carve up the person of Master, or Engineer, or crew member into a metaphysical duality. Following this approach, the Underwriter asserts that when the Master and Engineer decided to postpone reinstallation of the circuit breaker, or proceed to sea without it being in place, they were acting not as Master and Engineer, but somehow in the capacity of vicarious owners or shoreside management.