431 F.2d 1235
 F. B. WALKER & SONS, INC., a Corporation, Plaintiff-Appellee,
v.
Roy Lindley VALENTINE and all Other Underwriters at Lloyd's Subscribing Policy of Insurance No. L 1547 and Andrew Weir Insurance Company Ltd., and all Other Institute of London Underwriters Companies Subscribing Policy of Insurance No. C2253, and the Hartford Insurance Group, Defendants-Appellants.
 No. 27349.
 United States Court of Appeals, Fifth Circuit.
 September 4, 1970.
 
 E. S. Ned Nelson, Bryan & Gordon, Pascagoula, Miss., Brendan J. Connolly, Mendes & Mount, New York City, for appellants.
 Vincent F. Kilborn, Kilborn, Darby & Kilborn, Mobile, Ala., Roland J. Mestayer, Jr., Ward, Mestayer & Knight, Pascagoula, Miss., for appellee.
 Before JOHN R. BROWN, Chief Judge, JONES and CARSWELL,* Circuit Judges.
 JOHN R. BROWN, Chief Judge:
 
 
 1
 Lacking any of the romance of assailing thieves, rovers, pirates, barratry of master and/or crew as claims touching the adventures and perils which the Underwriters were contented to bear and take upon, Saskatchewan Government Insurance Office v. Spot Pack, Inc., 5 Cir., 1957, 242 F.2d 385, 1957 A.M.C. 655; Tropical Marine Products, Inc. v. Birmingham Fire Insurance Company of Pennsylvania, 5 Cir., 1957, 247 F.2d 116. 1957 A.M.C. 1946, and presenting nothing more beguiling than the Inchmaree Clause as the substantive basis of liability, this case covering the loss of the steel tub COBRA turns on the Watchman Clause[1] of American Institute Tug Form (Rev.1959). The District Court on a judge trial held the claim covered under Inchmaree Clause and the Watchman Provision had been complied with. Of the view that under maritime or Mississippi principles or an amphibious mixture of both, the Watchman Clause is valid and as a matter of uncontradicted evidence was not complied with we reverse.
 
 
 2
 The COBRA, a twin screw diesel powered steel tug sunk at her owner's wharf on the East bank of the East Pascagoula River[2] sometime between 8 p. m., October 17 and 6 a. m., October 18, 1965 at which time she was discovered sunk by Hudson, the watchman who had not watched her during the night. She was unmanned at the time, all of her threeman crew having left the tug upon making her secure to the wharf. The immediate cause of the sinking was excessive leakage of water through the rudder post stuffing box located in the aft compartment and the two main engine stuffing boxes located in the engine room. There was adequate proof that as a matter of good seamanship the rudder stuffing boxes located above the water line are not loosened during working operations. On the other hand the main engine stuffing boxes which are approximately 2 feet below the normal water line had to be loosened while the tug was operating to prevent the packing from burning out. As a part of this operation it was sketchily[3] but adequately proved that it was the part of good seamanship to tighten up the main engine stuffing boxes, when the tug was moored. This was not done. Again although sketchily proved, the Court was entitled to conclude that this direct cause of the sinking was covered under the Inchmaree Clause.[4]
 
 
 3
 Because we do not make credibility choices by rejecting findings made by the Trial Judge[5] we set out in some detail the sole testimony on the watchman problem all of which came from the highest responsible spokesman of the Assured. The watchman issue turned factually on the status, function, and responsibility of C. F. Hudson, then 70 years of age and deceased at the time of trial. He had a number of titles including watchman but whether he watched as a watchman or what he watched as a watchman, was something else again.
 
 
 4
 The Assured's brief characterizes Hudson's role along these lines. Hudson was in full charge of the tugs. He was night superintendent, dispatched and directed the tugs, was general custodian and watchman and timekeeper and "the man in general on the yard" who "directed traffic there." Hudson at the time was around seventy years of age, in good health and an experienced former boat captain and had been with Assured some three years. Hudson would make rounds. While he could sleep in his office he was normally awake all night. He had no clock to punch nor any certain rounds to make, though he had general watching duties and clocked in crews. Hudson did not have particular instructions to go, or not, on any of the vessels in any regular fashion during the night, nor did he have a specific duty of going on various tugs at night since he was "a little old for that" and would not have been expected to go aboard the COBRA unless, of course, there was a fire or something he observed from the outside. There were pumps available in the area where the COBRA was docked, adequate for use on boats sinking, and which Hudson knew how to use had he observed a vessel sinking. Walker could not say of his own knowledge whether Hudson had or had not made periodic checks of this particular vessel or any of the other tugs the night the COBRA sank. Walker knew Hudson had been on tugs but was not specifically required by Assured to go aboard tugs.
 
 
 5
 Paraphrasing the brief of Underwriters, Hudson's role could be pictured in this way.
 
 
 6
 The sinking was discovered by Hudson, who was employed by Assured as a night or weekend superintendent, general dispatcher, timekeeper and general custodian, but it was not his duty to go aboard the boats nor to inspect the bilges. Hudson, since deceased, was then 70 years old. He had been employed by Assured for three years and was considered too old to go aboard the vessels. Under Assured's normal procedure the vessels were not checked between the time they were moored at the dock on completion of the day's operation, and 8:00 a. m. the following morning when the next crew came on duty. Supporting this summary the brief pinpoints specific testimony. On direct examination Walker testified that Hudson, since deceased, was the "watchman" or "night superintendent" or "weekend superintendent" or "dispatcher" or "timekeeper" or "man in general" or "general custodian" or "whatever you might want to call him." On cross-examination, Walker testified that Hudson was not "instructed" or "expected" or "required" or "ordered" to go on board the COBRA or any of the vessels at the yard in any regular fashion during the night. Further, Hudson did not make a regular periodic check on the COBRA, or any of the vessels at the yard. Hudson was not given orders to do so. It was not a regular custom of Hudson to make such checks. Walker also reaffirmed his pre-trial deposition testimony that Hudson's duties did not include going on the COBRA or any of the vessels at night because "he was a little too old for that." In response to a direct question asked by the Trial Judge, Walker answered that it was not Hudson's duty to make checks on the function of the stuffing boxes, etc., for these vessels.
 
 
 7
 No matter how stated, no matter how favorably viewed from the standpoint of Assured in support of the degree, there was no watchman who was given the duty to make careful examination of the tug throughout including inspection of the bilges. Since Assured had not charged the so-called watchman with the duty of making careful examination aboard the vessel throughout her reaches, it is equally plain that no instruction was given with respect to what would or would not be "reasonable intervals". That brings us face to face with the validity, construction and application of the Watchman Clause (note 1, supra) under appropriate legal standards. Before getting to that it bears emphasis that the record — again from the mouth of the highest executive — compels the finding that as an operational, functional fact an inspection of the engine spaces and particularly the bilges would at some stage prior to the sinking have revealed the presence of excess water.[6]
 
 
 8
 At the outset, we think the efforts of Assured to create ambiguities in the Watchman Clause fails. As a part of a marine insurance policy which characteristically bears the marks of a "palimpsest text", Calmar Steamship Corp. v. Scott, 1953, 345 U.S. 427, 73 S.Ct. 739, 97 L.Ed. 1125, 1953 A.M.C. 952, this clause is stated with remarkable simplicity.
 
 
 9
 The obligation, whether a warranty, representation, promise, or what, is conditioned, of course, on the vessel's being "tied up or moored". We read this to mean that the watchman is required when the vessel is tied up or moored and the crew (or a significant part of the crew) is not aboard. Perhaps literally the Clause would apply whenever the vessel is simply "tied up or moored" as a physical proposition. But the function of the watchman is stated first in broad terms of one being "in charge of" the vessel. It would be incongruous for underwriters to demand that with Master, engineers and full crew above and below deck on board, the custody and control of the vessel would have to be surrendered for that period of time to a "watchman". There is no trouble about other provisions. At most, depending on the severity of the burden of proof, these present primarily factual questions for evaluation by the trier related to compliance such as instructions, if any, given to the watchman as a clear delineation of his "duty", what constitutes a "careful examination", what is "throughout the vessel", or what are "reasonable intervals", and the like.
 
 
 10
 In like vein no real problem on whether it is Mississippi or federal maritime law which controls is created under Wilburn Boat Co. v. Fireman's Fund Insurance Co., 1955, 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337, 1955 A.M.C. 467, or our post-remand decision, Fireman's Fund Insurance Co. v. Wilburn Boat Company, 5 Cir., 1962, 300 F.2d 631, 647 note 12, limiting application of State law marine insurance cases to those in which entrenched "federal precedent is lacking". See Purofied Down Products Corp. v. Travelers Fire Insurance Company, 2 Cir., 1960, 278 F.2d 439, 441 note 1; Southern Farm Bureau Casualty Insurance Co. v. Allen, 5 Cir., 1967, 388 F.2d 126; Gulfstream Cargo, Ltd. v. Reliance Insurance Company, 5 Cir., 1969, 409 F. 2d 974. On either law this record demonstrates noncompliance with the Watchman Clause.
 
 
 11
 We need not determine whether under Mississippi law the Watchman Clause has the status of a warranty.[7] The Mississippi Code Annotated, § 5687-05(C) provides in substance that for a statement in a policy application to bar recovery, it must materially affect acceptance of the risk or the hazard assumed. The Mississippi case law, so far as we are informed, does not discuss any statutory basis for the holdings. But the Court in Citizens' Nat. Life Ins. Co. v. Swords, 1915, 109 Miss. 635, 68 So. 920, distinguishing between warranties and representations held that "a warranty must be literally true and its materiality cannot be the source of inquiry". The Supreme Court of Mississippi repeated this same common law doctrine of strict compliance in later cases dealing with a non-marine policy. Home Insurance Co. of New York v. Cavin, 1931, 162 Miss. 1, 137 So. 490; Springfield Fire & Marine Ins. Co. v. Nix, 1932, 162 Miss. 669, 138 So. 598; World Fire and Marine Ins. Co. v. King, 1939, 187 Miss. 699, 191 So. 665. Although World Fire, supra, held that the iron safe warranty in a fire policy must be literally complied with the Court later in Continental Ins. Co. v. Thrash, 1955, 223 Miss. 344, 78 So.2d 344, held that the records warranty in a fire policy need only be substantially complied with.
 
 
 12
 But this controversy on "warranty" or "nonwarranty", "literal"[8] or "substantial" compliance gives no comfort to Assured on this record. Of course, compliance is generally a factual matter. Even though the law treats the warranty obligation as one calling for "strict" compliance, in measuring whether the specific acts called for are performed, it does not preclude a Court's determining that the conduct was in "substantial" compliance with the obligations strictly construed.
 
 
 13
 No matter how lax a standard is applied here there was simply no compliance, let alone substantial compliance. On the most favorable reading of the record Hudson, although perhaps a watchman, was certainly not "in charge of" the tug COBRA. He had a number of duties including dispatching of the harbor tugs in the movement of grain barges in and around the Port of Pascagoula. He was general superintendent and kept general watch. But he had no duty to go aboard the vessels at the wharf.[9] Whether, or to what extent, Hudson would or would not make an examination aboard is a complete unknown. More than that, the policy put the obligation squarely on the shoulders of Assured to instruct such a watchman as to the duties imposed. These instructions would, as a minimum, prescribe and define at least generally the nature of the examination aboard the vessel including the inspection of the bilges and the time and the frequency of the inspections. Obviously it could not be left to the watchman to determine wholly on his own without any prior guidance from the owner-assured concerning the sort of examination and inspection which would be reasonably "careful" and at reasonable intervals.
 
 
 14
 We need but briefly mention the assured's contention of operational compliance with "reasonable intervals". Vice president Walker, in an off-hand sort of way expressed the opinion that a reasonable interval would be the time at which the next crew came aboard. In other words, on his theory, when the tug is moored as it was here at approximately 8 p. m. there was no reasonable need for an inspection prior to the next morning at about 8 a. m. when the next crew might come aboard. This opinion did not undertake to express any standard reflected by the actions of the tugboat industry in general. Cf. Jarvis Towing and Transportation Co. v. Aetna, Ins. Co., 1948, 298 N.Y. 280, 82 N.E.2d 577; D/S Ove Skou v. Hebert, 5 Cir., 1969, 365 F.2d 341. More than that, it was a complete unknown whether there was to be a crew aboard the COBRA the next morning. At most the record permits a very thin inference that there would have been some crew on some boat the next morning. But the record is silent that any such crew would have had any obligation — or would have felt one — to make an inspection aboard the COBRA. More significant, any such theory virtually reads out of the policy the Watchman Clause. Under it the watchman is never needed if there is a crew to rejoin the vessel within 10 to 12 hours. Of course, what occurred here demonstrates the operational and functional utility and purpose of the Watchman Clause.
 
 
 15
 We are of the firm view that on the undisputed facts coming from the sole source of a high executive of Assured there was no compliance, substantial, strict or otherwise with the Watchman Clause. That was the bargain. It was not kept. There is no liability. Jarvis Towing and Transportation Co. v. Aetna Ins. Co., 1948, 298 N.Y. 280, 82 N.E. 2d 577.[10]
 
 
 16
 The Watchman Clause is valid. Whatever might be the result of a sinking occurring between rounds of a properly posted-instructed watchman, the claim otherwise covered fails when the Watchman Clause was not complied with in any real particular.
 
 
 17
 Reversed.
 
 
 
 Notes:
 
 
 *
 Judge Carswell did not participate in this decision
 
 
 [1]
 Line 121: "It is agreed that when this Vessel is tied up or moored, it shall be at all times in charge of a watchman in the employ of the Assured, whose duty it shall be to make careful examination of the Vessel throughout at reasonable intervals, including inspection of the bilges."
 
 
 [2]
 Assured operated a fleet of harbor tugs principally shifting grain barges within the port
 
 
 [3]
 The sole testimony was that of James Walker, Executive Vice President-General Manager of F. B. Walker & Sons, Inc., a family owned shipyard, tug boat enterprise. This included some excerpts from his pre-trial discovery deposition. The balance was exhibits comprising policy, marine survey reports, shipyard bills and correspondence to and from the Assured and the broker or Underwriter leading up to the denial of liability on the basis of unseaworthiness which, although still faintly urged would fail on any approach most favorable to the Underwriter. There was an ex parte statement offered by Underwriter, without objection, from the Master (who incidentally was fired for having left the vessel with the stuffing boxes untightened) in which he stated he tightened both stuffing boxes before departing the tug
 
 
 [4]
 The policy provided:
 [lines 76-88]:
 "This insurance also especially to cover * * * loss of or damage to the subject matter insured directly caused by the following: — Negligence of Master, Marineers, Engineers, or Pilots; Provided such loss or damage has not resulted from want of due diligence by the Assured the Owners or Managers of the Vessel, or any of them." Saskatchewan Government Insurance Office v. Spotpack, supra, 242 F.2d at 391-392, 1957 A.M.C. at 666-667; Tropical Marine Products v. Birmingham Fire Insurance Co. of Pennsylvania, supra, 247 F.2d at 118-119, 1957 A.M.C. at 1950-1951."
 
 
 [5]
 By a memorandum opinion which would otherwise satisfy the requirement of former Admiralty Rule 56 now F.R.Civ.P. 14(c), for findings of fact, see Myles v. Quinn Menhaden Fisheries, Inc., 5 Cir., 1962, 302 F.2d 146, 1962 A.M.C. 1626; Advisory Committee Notes, 1964, 34 F.R.D. 340, the closest the Judge got to a finding on this issue was in note 2. The Court, after quoting the Watchman Clause, stated: "there was nothing in the evidence before the Court to show any want of diligence of the Assured, or that all of the requirements as to the watchman had not been substantially met." The only other portion of the opinion even remotely touching the watchman issue was the discursive part following the Judge's holding that the tug sank because the packing glands on the drive shafts were not tightened after which he went on to state: "This loosened condition of this packing nut allowed water to slowly enter the vessel and fill it with water until the level of the packing gland on the rudder was reached, and that packing gland was likewise so loose as to allow water to enter the craft in large quantities. It took seven to eight hours for the craft to be lowered approximately eighteen inches at the stern before water came in over the deck and sank it immediately. The sinking of the vessel during the first eighteen inches of its lowering process was so gradual as to be imperceptible."
 
 
 [6]
 Walker expressed the opinion that the tug taking on water would sink within 3½ to 8 hours and for the Cobra, with a two foot freeboard it would have required about 2 feet of water in the engine room before water started coming over the deck. Up to that point the water entry was, of course, through stuffing boxes only
 
 
 [7]
 Assured, urging that the Watchman Clause merely states "it is agreed" urges a non-warranty status because in other parts of the policy where warranty is intended the term is expressly used. See the "F. C. & S. Clause", the "S. R. & C. C. Clause" and the following provisions, e. g.:
 Line 46: "Warranted by the Assured". (As to limits of use and navigation of the vessels).
 Line 56: "Warranted by the Assured". (That no other insurance is in force, etc.).
 Line 118: (Immediately before the Watchman Clause): "Warranted by the Assured". (That the underwriters will not be liable for seizure in illicit trade).
 Line 155: "Warranted". (That in case of casualty prompt notice will be given).
 
 
 [8]
 This was at least the pre-Wilburn rule for maritime insurance policies. Ciconett v. Home Ins. Co., 6 Cir., 1950, 179 F.2d 892; Aetna Ins. Co. v. Houston, Oil & Transport Co., 5 Cir., 1931, 49 F.2d 121.
 
 
 [9]
 By a schedule the insurance policy covered 4 tugs belonging to the Assured which presumably operated in and out of its pier
 
 
 [10]
 We reject as unsound Assured's contention, Kron v. Hanover Fire Ins. Co., 1964, 20 A.D.2d 670, 246 N.Y.S.2d 848, 850, aff'd, 15 N.Y.2d 521, 254 N.Y.S. 2d 119, 202 N.E.2d 563, thatJarvis was a decision based upon application of § 150, sub. 3 of the New York Insurance Law, McKinney's Consol.Laws, c. 28. Section 150(3) New York Insurance Law, excludes contracts of marine insurance from the purview of § 150(2) which lays down the legislative rule that a breached warranty will not void a policy unless such breach materially increases the risk of such loss. See Levine v. Aetna Ins. Co., 2 Cir., 1943, 139 F.2d 217; Red Top Brewing Co. v. Mazzotti, 1952, D.C., 107 F. Supp. 921, 923, aff'd 2 Cir., 1953, 202 F. 2d 481, cert. denied, 345 U.S. 958, 73 S.Ct. 941, 97 L.Ed. 1378; Ideal Cement Co. v. Home Ins. Co., 1953, D.C., 112 F.Supp. 413, 416, aff'd, 5 Cir., 210 F.2d 937.