**EMPLOYERS INSURANCE OF WAUSAU, Plaintiff,**

v.

**TROTTER TOWING CORP., A Corp., et al., Defendants.**

**TROTTER TOWING CORP., et al., Counter–Plaintiffs–Appellants Cross–Appellees,**

v.

**EMPLOYERS INSURANCE OF WAUSAU, Counter–Defendant–Appellee Cross–Appellant.**

No. 86–4790.

United States Court of Appeals, Fifth Circuit.

Jan. 4, 1988.

which Congress will explicitly grant that authority in specified circumstances.

Frank S. Thackston, Jr., Claude L. Stuart, III, Greenville, Miss., for appellants.

Gary T. Sacks, Joel K. Goldstein, St. Louis, Mo., Ernest Lane, III, Greenville, Miss., for appellee.

Before CLARK, Chief Judge, GEE and RUBIN, Circuit Judges.

CLARK, Chief Judge:

This case involves a dispute over whether a marine hull insurance policy issued by Employers Insurance of Wausau to Trotter Towing Corp. covers a fire that occurred on the vessel M/V SHENANDOAH. The district court erred in refusing to hold that, as a matter of law, the policy did not cover the fire. We affirm the district court's summary judgment denying punitive damages for alleged bad faith.

## I.

The policy in issue is the third consecutive annual policy contract between the parties. Trotter Towing Corp. (Trotter Towing) first purchased insurance policy number EWH–3095 from Employers Insurance of Wausau (Employers) for the period March 1, 1981 to March 1, 1982. This policy covered three motor vessels, two barges, and two flat decks valued from $50,000 to $5,000. A schedule of insured vessels showed the amount of coverage and the premium and deductible for each vessel. The first of this policy's eleven "Special Conditions," styled "Trading Warranty," stated: "Warranted confined to the use and navigation of the Mississippi River within 100 miles of Greenville, MS. M/V GLENDA S warranted laid-up and out of commission in a safe berth with permission to move as safety of the vessel require." The second Special Condition was styled "Automatic Acquisition Clause" (AAC).[1] This policy and both renewals provided in Special Condition 8A that the policy included "the affiliated and/or subsidiary companies of Trotter Towing Corporation as Ad-

ditional Assureds hereunder." Endorsement No. 3 added M/V MARTHA TROTTER (MARTHA TROTTER) to the schedule of insured vessels as of September 11, 1981, "for one trip from St. Louis to Greenville at which time she will assume port risk status." This policy did not define "port risk status." Endorsement No. 4 inexplicably insured M/V SHENANDOAH (SHENANDOAH) for $1,000,000 during a five day period from "September 25, 1982 to September 30, 1982" while "laid-up and out of commission in a safe berth."

Employers renewed EWH–3095 by issuing EWH–5148, effective March 1, 1982 to March 1, 1983. Although the terms of the two policies were substantially similar, EWH–5148 contained a "Port Risk Endorsement" which provided that its terms prevailed over any inconsistent policy provisions and warranted that "[t]he Vessel[s] shall be laid-up in the port of Approximate Mile Marker 537, Lower Mississippi [the Port of Greenville, Mississippi]." In addition to noting that all vessels were on port risk status, EWH–5148's schedule of vessels listed the SHENANDOAH valued at $2,000,000, the MARTHA TROTTER valued at $850,000, M/V GLENDA S valued at $75,000, and LA–21 FLAT DECK valued at $20,000. The policy included the same 100–mile Trading Warranty as a Special Condition just as it appeared in the prior policy. EWH–5148 also included the amended AAC. Endorsement No. 4 to EWH–5148 placed the MARTHA TROTTER on "full navigating status" as of September 13, 1982 at a premium rate twice that of the port risk rate. Endorsement No. 5 added LTS Towing (LTS) to the policy as "an Additional Assured as their interests may appear."

---

**1.** As amended by Endorsement No. 3, the AAC provided:

To automatically attach on any vessels acquired by the Assured whether through purchase, charter or otherwise, in consideration of daily pro rata additional premiums and it is agreed that this insurance is to follow the contracts of purchase, charters or other agreements of the Assured as respects the inclusion of other interests as named Assured or any loss payable clause subject to additional premium as agreed, if required.

For the purpose of this insurance additional vessels shall be considered as valued at the amounts declared by the Assured.

The Assured hereby warranting to report promptly such additional vessels and/or interest.

The prior AAC had required notice of acquisition within thirty days and limited Employers' liability to not more than $50,000 on any one vessel.

The policy at issue in this case, EWH–5234, renewed EWH–5148 for the period March 1, 1983 to March 1, 1984. The same four vessels that appeared in the EWH–5148 schedule of insured vessels appeared on the EWH–5234 schedule. The insured values of the SHENANDOAH and the MARTHA TROTTER were reduced to $1,700,000 and $550,000, respectively. All vessels except the MARTHA TROTTER were shown as at port risk. Endorsement No. 2 continued LTS as an additional assured. Endorsement No. 3 provided that "as respects to the M/V 'MARTHA TROTTER' the navigation limits are amended hereunder: 'Warranted confined to the use and navigation of the Mississippi River and its navigable tributaries (Western Rivers System) including the Gulf Intercoastal Waterway thereof.'" EWH–5234 contained the same Port Risk Endorsement as the prior policy and its Special Conditions contained the same 100–mile Trading Warranty and AAC as the two prior policies.

On April 13, 1983, Shenandoah Marine Corp. (Shenandoah Marine), the owner of the SHENANDOAH, entered a bareboat charter with Arkansas River Company to operate the SHENANDOAH for an indeterminate period of time. Arkansas River Company agreed to acquire marine hull insurance for the SHENANDOAH throughout the charter period. Trotter Towing requested its marine insurance broker to delete the SHENANDOAH from EWH–5234. Endorsement No. 4 to EWH–5234 deleted the SHENANDOAH from the policy, returned most of the initial premium charged for coverage of the SHENANDOAH under policy EWH–5234 and added Shenandoah Marine as an "Additional Assured."

In April or May of 1983, James Lancaster, the president of LTS, and Thomas Trotter, the president of Shenandoah Marine,[2] agreed that, if LTS was the successful bidder for a contract with the Corps of Engineers, LTS could operate the SHENANDOAH. When LTS learned that it was the low bidder, Shenandoah Marine advised Arkansas River Company to return the

SHENANDOAH. Thomas Trotter knew that the marine hull insurance acquired by Arkansas River Company ended on the date that the SHENANDOAH was returned, July 12, 1983. Trotter testified that he had intended to notify his insurance broker of the SHENANDOAH's return, but for various reasons no notice was communicated.

On August 17, 1983, the SHENANDOAH, operated by LTS under a bareboat charter, left Greenville. On September 11, 1983, while navigating northbound between Mile 714 and 716 of the Upper Mississippi River (approximately 177 miles from Greenville, Mississippi), a fire broke out near the starboard main engine which extensively damaged the SHENANDOAH.

Employers learned that LTS had been operating the SHENANDOAH when the insurance broker called on September 11 to report the fire. Three days later LTS and Trotter Towing claimed that the SHENANDOAH was covered by policy EWH–5234 at the time of the fire. They reasoned that LTS, an additional assured, acquired the SHENANDOAH by charter on August 17, 1983, from its owner, Shenandoah Marine, also an additional assured and that the AAC automatically provided coverage. Until LTS and Trotter Towing made this claim, Employers did not know that Arkansas River Company had returned the SHENANDOAH, that it had been chartered by LTS, that it had left the port of Greenville or that it had been damaged by fire. Employers responded to the claim by denying coverage on several grounds.

On October 24, 1983, Employers filed a declaratory judgment action in district court seeking a bench ruling that policy EWH–5234 did not cover the SHENANDOAH for this fire loss. Trotter Towing and LTS filed diversity based counterclaims for losses allegedly covered by the insurance policy. The district court dismissed Employer's declaratory judgment action and Trotter Towing and LTS amended their complaint to seek punitive damages for bad faith denial of coverage.

2. Thomas Trotter is the president of Shenandoah Marine and Trotter Towing.

A bifurcated trial followed on the questions of coverage and bad faith. A jury found that the policy covered the fire on the SHENANDOAH and awarded $1,000,-000 in damages and $250,000 in prejudgment interest. The district court granted Employers' motion for summary judgment on the bad faith issue and rejected the motion of Trotter Towing and LTS to alter or amend this ruling.

Both sides appeal. Employers contends that the policy, as a matter of law, did not cover the fire on the SHENANDOAH. Trotter Towing and LTS contend that the district court improvidently granted Employer's motion for summary judgment on the bad faith issue. We hold that coverage does not exist as a matter of law and we affirm the summary judgment on bad faith.[3]

## II.

State law governs construction of marine insurance contracts except where it is displaced by admiralty law. *Elevating Boats, Inc. v. Gulf Coast Marine, Inc.*, 766 F.2d 195, 198–99 (5th Cir.1985); *Continental Oil Co. v. Bonanza Corp.*, 677 F.2d 455, 462 & n. 7 (5th Cir.1982), *vacated on other grounds*, 706 F.2d 1365 (5th Cir.1983) (en banc).

### A. Coverage

Mississippi law and federal admiralty law provide consistent guidelines for construing policy EWH–5234. First, the court must decide, as a matter of law, whether a policy is ambiguous, i.e., susceptible to more than one reasonable interpretation. *State Farm Mutual Auto. Ins. Co. v. Taylor*, 233 So.2d 805, 810 (Miss.1970) (employee exclusion clause in an automobile liability insurance policy); *Coastal Iron Works, Inc. v. Petty Ray Geophysical*, 783 F.2d 577, 584–85 (5th Cir.1985) (applying Texas law to interpretation of shipyard's insurance policy). The mere

fact that policy language requires interpretation does not render the policy ambiguous. *Parfait v. Central Towing*, 660 F.2d 608, 610 (5th Cir.1981). When reasonable, clauses of a marine policy must be read together and harmonized. *Continental Casualty Co. v. Hester*, 360 So.2d 695, 697 (Miss.1978) ("[i]t is axiomatic that all provisions of an insurance policy must be so construed, if possible, to give effect to each"); *Scarborough v. Travelers Ins. Co.*, 718 F.2d 702, 708 (5th Cir.1983) (applying Louisiana law which requires that clauses be read "so as to give effect, if possible, to every part of the agreement"). Second, an ambiguous policy drafted by an insurance company will be strictly construed against the insurance company and "when the provisions of an insurance policy are subject to two interpretations equally reasonable, that interpretation which gives greater indemnity to the insured will prevail." *Taylor*, 233 So.2d at 810; *see also Coastal Iron Works*, 783 F.2d at 584–85.

Trotter Towing contends that policy EWH–5234 is ambiguous. It urges that a reasonable interpretation entitles the SHENANDOAH to coverage subject to the broad navigational limits granted to the MARTHA TROTTER based on the following analysis. Endorsement No. 3 authorized the MARTHA TROTTER to navigate the entire Mississippi River ("all river" status). When LTS, an "Additional Assured," began operating the SHENANDOAH on August 17, coverage was triggered under the AAC. While the AAC does not specify the scope of coverage that attaches, Endorsement No. 2 added LTS to the policy "as their interests may appear." Among the scheduled vessels, LTS had an interest only in the MARTHA TROTTER.[4] The "all river" navigational status of the MARTHA TROTTER, the only vessel in which LTS had an interest, therefore applies to the SHENANDOAH. The statement in the schedule of vessels, "[e]ach vessel separately insured," reinforces this interpreta-

---

**3.** LTS and Trotter Towing filed joint briefs and were jointly represented by counsel. For convenience, this opinion hereafter refers only to Trotter Towing when discussing their litigation position.

**4.** Since approximately one year prior to August 17, 1983 LTS had been operating the MARTHA TROTTER pursuant to a bareboat charter.

tion. Because the SHENANDOAH burned at a location on the Mississippi River where the MARTHA TROTTER would have been covered, the SHENANDOAH was covered.

Employers disputes every premise of Trotter Towing's interpretation. First, Employers contends that the SHENANDOAH was not insured under the AAC. Employers argues that only the "named Assured," Trotter Towing, not an additional assured, can acquire a vessel under the AAC. Employers also argues that LTS failed to comply with the AAC's requirement to promptly report any acquisition. According to Employers, the district court erred by directing a verdict that LTS acquired the SHENANDOAH on August 17. Employers argues acquisition occurred when Arkansas River Company returned the SHENANDOAH on July 12, 1983. Similarly, LTS contends that the district court erred by instructing the jury that the word "promptly" meant "within a reasonable time under the circumstances." Second, Employers contends that the 100-mile Trading Warranty applied to the SHENANDOAH. Third, Employers contends that there was an agreement that the SHENANDOAH be placed on port risk status upon its return from Arkansas River Company. Fourth, Employers argues that a defective $CO_2$ fire suppression system rendered the SHENANDOAH unseaworthy at the inception of the risk which precludes extension of coverage and that the district court erred by excluding evidence of a 1977 fire on the SHENANDOAH.

We hold that Trotter Towing's interpretation of the policy is unreasonable for the following reasons. First, neither the as-their-interests-may-appear clause from Endorsement No. 2 nor the separately-insured clause from the schedule of vessels defines the scope of the insurance coverage that attaches by operation of the AAC. *Cf. St. Paul Fire & Marine Ins. Co. v. Vest Transp. Co.*, 666 F.2d 932, 944–45 (5th Cir. 1982) (the policy language "each vessel deemed a separate insurance" construed to preclude attributing negligence between insured vessels to create coverage). While we assume without deciding that LTS's status as an additional assured authorizes it to

acquire interests in vessels that will be insured under the AAC, Endorsement No. 2 does no more than designate LTS "an Additional Assured." The as-their-interests-may-appear clause allows the interest of LTS to be defined by legal relationships that may be shown to exist at the time of a loss. It does not fix the scope of coverage nor does it negate the Trading Warranty.

Second, Trotter Towing's interpretation ignores the importance of the intended use of the vessel in fixing premiums and fails to construe the policy as a whole. When EWH–5234 first went into effect, Employers insured the SHENANDOAH on a port risk basis. Trotter Towing paid $22,100 in premiums on the SHENANDOAH based on an insurance rate of 1.30% and an agreed value of $1,700,000. When the SHENANDOAH was removed from the policy, Employers returned $19,492.20 of the $22,100 premium. Employers issued Endorsement No. 3 to EWH–5234 which placed the MARTHA TROTTER on "all river" status upon specific request by Trotter Towing and LTS after evaluating underwriting data and after assessing a premium fixed at twice the rate for port risk coverage. At no time after its return by Arkansas River Company was the SHENANDOAH evaluated for navigational risk nor was any additional premium agreed upon or assessed.

Trotter Towing would define the scope of coverage that attaches when the AAC operates by reference *only* to the insured status of one additional assured's separately scheduled vessels. Coverage and premiums at the highest risk and expense would attach regardless of the intended use of the vessel. This construction ignores the importance of an agreement between the insurer and insured as to intended use in fixing premiums. It also ignores the fact that the policy insured Trotter Towing as the "named Assured" as to all covered vessels and entirely disregards the existence of the Trading Warranty.

Third, there is a reasonable construction of the AAC which would harmonize all policy provisions. It begins with the assumptions that "the Assured" in the AAC should be construed to encompass addition-

al assureds as well as the named assured, and that one additional assured could acquire a vessel from another additional assured since no express language forbids such assumptions. The construction would define AAC coverage, not woodenly, but in accordance with the facts and circumstances of each specific acquisition "in consideration of daily pro rata additional premiums ... to follow the contracts of purchase, charters, or other agreements of the Assured." For example, if the SHENANDOAH had been acquired by purchase or charter outside the geographic confines of the Trading Warranty, the daily pro rata additional premium would be based on the risk assumed until the vessel came within the navigational limits of the Trading Warranty or under the port risk premium provision. Conversely, if a vessel which had been at port risk was to be acquired in the port of Greenville and the assured wished it to assume navigating status, the terms of the policy for adjusting the risk must be complied with before additional coverage would become applicable.

LTS maintains it acquired the SHENANDOAH in the Port of Greenville a month after Arkansas River Company returned it to Shenandoah Marine. Just how the AAC operated when Shenandoah Marine reacquired the SHENANDOAH from Arkansas River Company or what status the SHENANDOAH acquired under the policy between the date of that acquisition—July 12, 1983—and the date Shenandoah Marine turned the vessel over to LTS—August 17, 1983—was never resolved in the trial court. We need not resolve it here because, construing policy EWH–5234 most strongly against Employers, the only reasonable interpretation which would relieve the SHENANDOAH from port risk status and cancellation under that endorsement when it left Greenville would assume that the SHENANDOAH was on navigational status when it was chartered by LTS. If this be assumed, then the SHENANDOAH would have been subject to the constraints of the 100–mile Trading Warranty. While it is reasonable that acquisition of a vessel outside the geographic limits of the policy's coverage provisions could automatically provide coverage pending prompt notice, an agreement of an assured with a third party to take a covered vessel outside these navigational limits could not.

■ The September 11, 1983, fire on the SHENANDOAH occurred more than 100 miles from Greenville. LTS therefore breached the Trading Warranty. The insurance policy states that "[a]ny deviation beyond the navigation limits provided herein shall void this policy." Breach of an express warranty regarding location of a vessel in a marine insurance policy suspends coverage under federal admiralty law and Mississippi law. *See Graham v. Milky Way Barge, Inc.,* 824 F.2d 376, 383–84 (5th Cir.1987); *F.B. Walker & Sons, Inc. v. Valentine,* 431 F.2d 1235, 1238–40 (5th Cir.1970); *Robinson v. Home Ins. Co.,* 73 F.2d 3, 4 (5th Cir.1934), *cert. denied,* 294 U.S. 712, 55 S.Ct. 508, 79 L.Ed.2d 1246 (1935). *Cf. United States Fire Ins. Co. v. Cavanaugh,* 732 F.2d 832 (11th Cir.), *cert. denied,* 469 U.S. 1036, 105 S.Ct. 512, 83 L.Ed.2d 402 (1984) (no suspension of coverage where breach of navigational restrictions is not attributable to a voluntary act of the insured). The SHENANDOAH "was operating beyond the navigational and operational limits imposed on it by its insurance polic[y] and was thus not covered by [that] polic[y] at the time of the accident." *Graham,* 824 F.2d at 384. Because we find that the Trading Warranty applies to acquired vessels, we do not reach the other issues raised by Employers.

### B. Punitive Damages

Assuming that Trotter Towing's claim for punitive damages might survive the reversal of the award based on policy coverage, we nonetheless hold that the district court properly denied punitive damages.

■ This court looks to the relevant state law to determine whether punitive damages may be imposed for alleged breaches of marine insurance policies. *See, e.g., Offshore Logistics Servs., Inc. v. Arkwright–Boston Mfrs. Mutual Ins. Co.,* 639 F.2d 1142, 1145–46 (5th Cir.1981) (applying Louisiana law). While federal law may

impose on marine insurers a high duty of good faith, Mississippi law proscribes imposition of punitive damages where the insurer possesses an "arguable reason" for denying coverage. *Gulfstream Cargo, Ltd. v. Reliance Ins. Co.*, 409 F.2d 974, 981 & n. 20 (5th Cir.1969) (marine insurance contracts require the highest degree of good faith); *Standard Life Ins. Co. of Indiana v. Veal*, 354 So.2d 239, 248 (Miss.1978) ("if an insurance company has a legitimate reason or an arguable reason for failing to pay a claim, punitive damages will not lie"). The term "arguable reason" embodies "a distinction between ordinary torts, the product of forgetfulness, oversight, or the like; and heightened torts, which are the product of gross, callous or wanton conduct, or, if intentional, are accompanied by fraud or deceit." *State Farm Fire & Casualty Co. v. Simpson*, 477 So.2d 242, 250 (Miss.1985). Only the latter, which rises "to the heightened level of an independent tort," justifies imposition of punitive damages under Mississippi law. *Id.*

Trotter Towing argues first that punitive damages should be imposed because Employers filed a declaratory judgment action which was dismissed by the district court as having been filed to gain an unfair procedural advantage in anticipation of litigation. Second, Trotter Towing complains of Employers' conduct in the course of the declaratory judgment proceedings. Third, Trotter Towing contends that inspectors hired by Employers conducted an inadequate investigation of the fire and that Employers unreasonably construed the policy to deny coverage.

Trotter Towing does not urge that a genuine issue of material fact existed. Rather, it contends that the district judge applied incorrect standards for the imposition of punitive damages. Because we find that the comprehensive opinion of the district court applied the proper standards, we affirm the summary judgment denying punitive damages.

### III.

As a matter of law, the insurance policy issued for Trotter Towing did not cover the fire on the SHENANDOAH because the 100–mile Trading Warranty was breached. The district court properly granted a summary judgment denying punitive damages. The judgment appealed from is

AFFIRMED in part and, in part, REVERSED.